THE HOWARD HUGHES COMPANY, LLC, F.K.A. THE HOWARD HUGHES CORPORATION, AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HOWARD HUGHES PROPERTIES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10539–11, 10565–11.           Filed June 2, 2014.

Ps are in the residential land development business and develop land in and adjacent to Las Vegas, Nevada. Ps sell land to builders and, in some cases, individuals, who construct and sell houses. Ps generally sell land through bulk sales, pad sales, finished lot sales, and custom lot sales. In bulk sales, Ps develop raw land into villages and sell an entire village to a builder. Ps do not otherwise develop the sold village. In pad sales, Ps develop villages into parcels and sell the parcels to builders. Ps do not develop within the sold parcels. In finished lot sales, Ps develop parcels into lots and sell whole parcels of finished lots to builders. In custom lot sales, Ps sell individual lots to individual purchasers or custom home builders, who then construct homes. In all instances, Ps do not construct residential dwelling units on the land they sell. During the years at issue, Ps reported income from purchase and sale agreements under the completed contract method of accounting. R alleges Ps' contracts are not home construction contracts within the meaning of I.R.C. sec. 460(e). R further contends the land sale contracts are not long-term construction contracts and are not eligible for the long-term percentage of completion method of accounting under I.R.C. sec. 460. *Held*: Ps' bulk sale and custom lot contracts are long-term construction contracts. *Held*, *further*, Ps' contracts are not home construction contracts within the meaning of I.R.C. sec. 460(e), and Ps may not report gain and loss from these contracts using the completed contract method of accounting.

355

*Stephen F. Gertzman*, *Kevin L. Kenworthy*, *Steven R. Dixon*, *Mary W.B. Prosser*, and *Sat Nam S. Khalsa*, for petitioners.

*Ronald S. Collins, Jr.*, *Bernard J. Audet, Jr.*, and *John R. Gilbert*, for respondent.

WHERRY, *Judge*: These cases, consolidated for trial, briefing, and opinion, are before the Court on petitions for redetermination of Federal income tax deficiencies. Respondent determined deficiencies for the 2007 and 2008 tax years of petitioner the Howard Hughes Co., LLC (THHC) (formerly the Howard Hughes Corp. & Subsidiaries (Old THHC)), and deficiencies for the 2007 and 2008 tax years for petitioner Howard Hughes Properties, Inc. (HHPI). The issue for consideration concerns the proper method of accounting for income from certain contracts. Respondent alleges that, with respect to most of petitioners' contracts, petitioners must use the percentage of completion method of accounting instead of the completed contract method of accounting. Petitioners, however, contend that because their contracts qualify as home construction contracts within the meaning of section 460(e)(6), they properly reported income on the completed contract method. [1] Respondent further alleges that certain other contracts are not long-term contracts or construction contracts and that petitioners cannot account for the gain or loss from these contracts under section 460.

### FINDINGS OF FACT

The parties' stipulation of facts and supplemental stipulation of facts, both with accompanying exhibits, are incorporated herein by this reference. At the time petitioners filed the petitions, their principal place of business was Dallas, Texas. Their main business operations, however, are in Las Vegas, Nevada.

*Company Background*

When Howard Hughes died in 1976, his portfolio of assets, owned by Summa Corp., included land which was then out-

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

side the city of Las Vegas, Nevada. In the 1980s this land was selected for development. The land was called Summerlin, which was the maiden name of Mr. Hughes' paternal grandmother. Summerlin was divided into three geographic regions: Summerlin North, Summerlin South, and Summerlin West.

In 1996 the Rouse Co. (Rouse), a publicly traded corporation based in Columbia, Maryland, acquired the assets of the Hughes estate, including Howard Hughes Properties LP (HHPLP), which owned Summerlin. Effective January 1, 1998, Rouse elected to be treated as a real estate investment trust (REIT) in 1998. As part of this conversion Rouse organized HHPI, which in turn purchased the undeveloped acreage in Summerlin North and South from HHPLP. In December 1997 HHPLP had distributed Summerlin West to Old THHC. In 2004 General Growth Properties, Inc. (GGP), a publicly traded REIT, acquired Rouse by merger. During the tax years at issue, GGP was the general partner in a limited partnership, which, through another limited partnership, the Rouse Co. LP, and a limited liability company, Rouse LLC, owned HHPI and the Hughes Corp., which in turn owned Old THHC.

In 2009 GGP and its affiliated entities filed for bankruptcy under chapter 11 of the U.S. Bankruptcy Code. Effective December 31, 2009, Old THHC converted from a corporation to a Delaware limited liability company, which is petitioner THHC in these cases. As part of the plan of reorganization in 2010 GGP spun off the part of its business that owned Summerlin. A newly formed entity, the Howard Hughes Corp., an entity distinct from Old THHC, ended up owning, as second- and third-tier subsidiaries, HHPI and THHC. THHC owns Summerlin West, and HHPI owns Summerlin North and Summerlin South to the extent that these properties have not yet been sold to third parties.

*Summerlin*

During the years at issue petitioners were in the residential land development business. They generated revenue primarily by selling property to builders who would then construct and sell homes. In some cases, they also sold property to individual buyers who would then construct single-family

residential homes. The land petitioners sold and still sell is part of a large master-planned community known as Summerlin.

Summerlin comprises approximately 22,500 acres on the western rim of the Las Vegas Valley, about nine miles west of downtown Las Vegas. As of the end of 2010 approximately 100,000 residents lived in 40,000 homes in Summerlin. At completion, petitioners expect Summerlin to house approximately 220,000 residents. While Summerlin is largely residential, it is a fully integrated community, which means it includes commercial, educational, and recreational facilities. It contains about 1.7 million square feet of developed retail space, 3.2 million square feet of developed office space, 3 hotels, and health and medical centers. It has 25 public and private schools, 5 higher learning institutions, 9 golf courses, parks, trails, and cultural facilities.

Summerlin North and Summerlin West are, as a result of annexation, part of the city of Las Vegas, and Summerlin South is in Clark County, Nevada. The first residential land sales in Summerlin North took place around 1986, and by the years at issue HHPI had fully developed Summerlin North. The first land sales in Summerlin South took place in 1998, and the first land sales in Summerlin West took place in 2000. Each of these three geographical regions is further divided into villages, each of which averages about 500 acres. Villages are further divided into parcels, or neighborhoods, which contain the individual lots. These cases involve only petitioners' sales of land in Summerlin South and Summerlin West.

Petitioners' sales generally fell into one of four categories: pad sales, finished lot sales, custom lot sales, and bulk sales.[2] In a pad sale, petitioners, after dividing the village into parcels, constructed all of the infrastructure in the village up to a parcel boundary. Petitioners then sold the parcel to a buyer, who was usually a homebuilder. The builder, with petitioners' approval, was responsible for all of the infrastructure (such as streets and utilities) within the parcel and subdividing the parcel into lots. In a finished lot sale, petitioners also divided the village into parcels. They then fur-

---

[2] The parties disagree over whether the bulk sales contracts are in substance different from the pad sales contracts. We resolve this issue *infra*.

ther constructed any additional needed parcel infrastructure, divided the parcels into lots, and sold the neighborhoods to a buyer, usually a homebuilder. In finished lot sales, petitioners constructed all of the infrastructure up to the lot line. In both the pad sales and the finished lot sales, petitioners contracted with homebuilders through building development agreements (BDAs). The BDAs were more than just simple sales contracts that, for consideration, pass title. We discuss the parties' responsibilities *infra*. In doing so, we do not purport to cover all of the details but simply address some important aspects of the BDAs.

Custom lot sales were essentially the same as finished lot sales except that petitioners sold the individual lots. The buyers of these individual lots were individuals who were contractually bound to build a residential dwelling unit.[3] The purchase sales contracts required the individuals to agree that they would occupy the home for at least one year or, if the home was sold before then to a third party, to pay additional consideration of 10% of the third-party price. Finally, in a bulk sale, petitioners sold an entire village to a purchaser. The purchaser was responsible for subdividing the village into parcels and lots and for constructing all of the infrastructure improvements within the village.

Even though the builders were ultimately responsible for building and selling homes to the end user—the homebuyer—petitioners marketed to the homebuyers. Petitioners' marketing strategy embodied the idea of the master-planned community, and they viewed Summerlin as a brand that evokes thoughts of an attractive lifestyle and community. But petitioners did not bear the sole burden of the marketing cost. In fact, their agreements with the builders required the builders to pay into an advertising program promoting Summerlin. The builders paid, upon the close of escrow of a home sale, a fee equal to 1% of the purchase price.

___

[3] The parties stipulated that the sales in all custom lot contracts were made to "an individual purchaser". A review of the list of custom lot contracts, however, reveals that some of the buyers appear to be builders (e.g., Executive Home Builder, Six Star Construction, Inc., and PMR Homes, Inc.). This apparent discrepancy may result from the meaning of "individual purchaser" but is irrelevant to our ultimate holding. For simplicity, we will rely on the parties' stipulation.

We discuss *infra* the general process THHC and HHPI undertake in their home development business. Much of the trial was devoted to the details of the process, and we by no means purport to address every step. Our intention is not to discount those important steps not addressed but to provide a general picture of how the development process worked.

*Developing Summerlin—Entitlements*

Petitioners were parties to master development agreements with Las Vegas, Nevada, and Clark County, Nevada, that govern the planned development of Summerlin West and Summerlin South, respectively. These long-term, 30-year agreements assure petitioners that they will be able to develop the land in accordance with the agreements and remove any necessity to negotiate development agreements and entitlements village by village.

*Summerlin West*

Las Vegas, pursuant to powers delegated by the State of Nevada by chapter 278 of the Nevada Revised Statutes, adopted in April 1992 the City General Plan, which is a master land use plan. HHPLP and Las Vegas signed a development agreement (LVDA) in February 1997. The LVDA was recorded in the Clark County, Nevada, Recorder's Office and was approved by the Las Vegas City Council. Along with approvals and plans referenced within the agreement, the LVDA governed land development in Summerlin West. Las Vegas also amended its City General Plan to incorporate the Summerlin West General Development Plan, which conceptualized future development of Summerlin West, and rezoned Summerlin West from a rural district to a planned community district.

The Summerlin West Development Standards, attached to the LVDA, set minimum requirements for development, including "residential densities; building height and setbacks; signage; landscaping; parking and open space requirements; as well as procedures for site plan review and for modifying the Planned Community Program." The LVDA states that development of Summerlin West will occur in phases called villages. The owner has to prepare and submit for city approval a Village Development Plan for each village. A vil-

lage traffic study and a village drainage study also had to accompany the village development plan.

Initially, the LVDA permitted 20,250 residential units, 5.85 million square feet of office, retail, or industrial space uses on 508 acres of land, golf courses featuring up to 90 holes of golf, and related facilities. Other uses described in the Summerlin West General Development Plan were also contemplated. The LVDA required HHPLP to maintain medians but allowed HHPLP to assign that responsibility to homeowners associations. HHPLP granted the city the right to construct traffic signals, turn lanes, and similar improvements as necessary. The LVDA also required HHPLP to donate land to the city and construct a fire station on that land and to donate up to five acres of land to the city for a satellite government center. In addition, HHPLP was to donate land to the city for a public park with sports and recreational facilities and assume the cost of constructing a sewer interceptor. With respect to traffic and transportation, the LVDA required HHPLP to provide, or at least provide adequate assurance that it would provide, standard improvements in connection with each village. Standard improvements were "mitigation measures and improvements required for intersections and roadways immediately adjacent to the Planned Community." HHPLP also agreed to dedicate land needed for the right of way to the city for a major arterial road, the Summerlin Parkway extension.

In November 2003 Old THHC, as the successor in interest to HHPLP, and the city amended the LVDA to require Old THHC to allocate a certain minimum amount of recreational space per 1,000 residents, construct a neighborhood pool, and design and construct a police substation with a helicopter landing pad. The amended LVDA also increased the allowed number of residential units from 20,250 to 30,000. Petitioner THHC was and is, as successor in interest to Old THHC, subject to the LVDA as amended.

### Summerlin South

Clark County, Nevada, pursuant to the powers delegated by the State of Nevada, adopted the Clark County Master Plan in 1983. It and HHPLP also signed and recorded a development agreement (CCDA) in February 1996 to govern the development of Summerlin South. Before the CCDA,

Clark County had amended its County Master Plan to include the Land Use and Development Guide for Summerlin's Southern Comprehensive Planned Community (Land Use and Development Guide). Clark County also rezoned Summerlin South from a rural district to a planned community district.

The CCDA provided that Summerlin South would be developed in accordance with the Summerlin Master Plans, which consisted of the Land Use and Development Guide, a Summerlin Master Parks and Public Facilities Plan, a Summerlin Master Transportation Plan, and a Summerlin Master Drainage Plan. As with the LVDA, the CCDA envisioned development by phases called villages, and HHPLP agreed to submit a Village Development Plan before beginning development of a village. HHPLP also agreed to submit with the Village Development Plan a traffic study, a drainage study, and a parks and public facilities plan.

Under the CCDA, Summerlin South could contain up to 18,000 residential dwelling units, 740 acres for nonresidential private uses, 90 holes of golf and related facilities, 3 hotels/casinos, and other land uses and facilities. The CCDA obligated HHPLP to construct a fire station, donate up to 5 acres of land for a satellite government center, which may include the fire station, and dedicate up to 20 acres of land for a community sports park. The CCDA also obligated HHPLP to submit the Master Parks and Public Facilities Plan, which was to generally identify the location and development timing of parks, trails, and public spaces systems. HHPLP also was to submit a Master Transportation Study, provide the necessary improvements to mitigate the development's traffic impact, provide village access roads for each village, and bear all public and private expenses, such as roadway construction, lighting, drainage, signage, and landscaping expenses related to Summerlin South's internal roadway network. The CCDA further required HHPLP to prepare a technical drainage study and construct flood facilities which were to be integrated where possible with the trails and parks systems.

The parties, Clark County and HHPI, as successor in interest to HHPLP, have amended the CCDA three times, most recently in July 2005. The most recent amendment increased the number of permissible residential dwelling

units to 32,600. In return, HHPI agreed, inter alia, at its expense to purchase and provide a 100-foot aerial fire truck with operating equipment; design, construct, and convey a second fire station; and convey 2.5 acres of land to the county for a third fire station. In addition, HHPI agreed to convey 25 acres or more of land to the county for recreational purposes or 30 acres or more for a sports park to be designed and constructed by HHPI, and a community center and outdoor aquatic center to be designed and constructed by HHPI.

*Developing Summerlin—Covenant, Conditions, and Restrictions*

Petitioners and their predecessors in interest recorded Master Declarations, which govern use of the land by subsequent owners. These declarations, also known as covenants, conditions, and restrictions (CC&Rs), not only imposed use restrictions and protective covenants, but also created homeowners associations. The Master Declarations served as the governing documents for the homeowners associations. The declarations applied to an initial set of properties within Summerlin, but allowed petitioners to annex property, thereby expanding the community subject to the declarations.

The Master Declarations provided for the establishment of village subassociations through new declarations. The subassociation declarations supplemented the Master Declarations. These subassociations were responsible for owning and maintaining certain common elements and/or exclusive amenities associated with a neighborhood and for enforcing their own covenants, conditions, and restrictions. A neighborhood, which could include a gated community, consists of properties which share exclusive amenities or common areas.

The Summerlin South Master Declaration established the Summerlin South Design Review Committee. This committee had to approve "construction, alteration, grading, additions, excavation, modification, decoration, redecoration or reconstruction of an Improvement or removal of any tree in any Phase of Development". The Summerlin West Master Declaration established a similar review process. In both cases, petitioners retained control over the review process until such time as they no longer owned an interest in the

respective Summerlin West and Summerlin South geographic regions.

*Developing Summerlin—Villages*

Petitioners developed Summerlin in village phases starting with the villages adjacent to existing development to take advantage of the infrastructure. Subsequent villages could likewise take advantage of the additional infrastructure created by the adjacent villages.

Generally, the first step in petitioners' development activities was to survey the property and create and file a parcel map. The parcel map broke off a village-size piece for development and sale by petitioners. Petitioners also had to grant easements for utilities and drainage and dedicate public streets. The parcel map reflected these easements and dedications.

Often, Clark County or Las Vegas imposed obligations on petitioners with respect to street grading, surfacing, and alignment and provisions for drainage, water quality and supply, sewerage, and particular lot designs. Before developing the land, petitioners prepared and filed a tentative map. Along with this map, petitioners conducted technical studies, such as traffic and drainage studies, and established a village development plan, which is required by the LVDA and the CCDA and established the specific zoning, uses, and entitlements within the villages. Normally, the governing agency required petitioners to design and construct the improvements on the tentative map as a condition of approval of the map. But in certain cases, petitioners requested waivers. For instance, if a road was not immediately necessary, petitioners could request a waiver delaying construction until it was necessary. In addition, the tentative maps did not show all of the improvements that petitioners would construct on the parcels. For instance, they did not show landscaping, wall, and dry utility improvements.

Petitioners also prepared improvement plans for the improvements shown on the tentative maps. It took about nine months to one year to prepare these plans and for the governing agency to review and approve them.

Once the various governmental bodies approved the tentative map, petitioners were required to also submit a final

subdivision map. In the case of pad sales, the builders also had to prepare and submit tentative and final maps to further subdivide the pad land into lots. The pad purchase contracts governing pad sales also required the builders to first submit these maps to petitioners for approval.

The final map showed roads and easements that petitioners intended to dedicate to the public. These easements included those for wet utilities, such as sewer and water, and dry utilities, such as electric, telecommunications, and gas. Absent a Special Improvement District (SID), the approving governmental body could require petitioners to enter agreements whereby petitioners posted bonds to ensure completion of the agreed-upon improvements. These improvements may have included streets, alleys, curbs, gutters, sidewalks, medians, streetlights, traffic signals, sewer systems, drainage facilities, open space improvements, trails, parks, and landscaping. Petitioners obtained and posted bonds based on the unit rate times required material as determined by the agency that requires the bond. The agency commented on and required modifications to or approved the bond, and it exonerated petitioners only when the improvements were fully constructed and inspected and the agency took ownership.

Petitioners also used tax-exempt SIDs financing to finance construction of some Summerlin infrastructure improvements. In a project financed by SID bonds, petitioners did not have to post performance bonds. These SID bonds financed public improvements such as street, water, sewer, and storm drainage improvements. Petitioners were entitled to reimbursement from the money raised from the sale of the SID bonds when they incurred the relevant construction costs, subject to the approval of the relevant municipal authority. Special assessments on the property within the SID covered the scheduled bond payments. SID financing was not available to cover dry utilities, landscaping, and walls. Summerlin West and Summerlin South contain seven SIDs. The total amount of the SID bonds was $183,685,000.

*Villages at Issue*

Respondent's determinations concern income from 107 BDAs[4] for the sale of land in 9 of petitioners' villages. Those villages are: Village 13 (Summerlin Centre), Village 14B (The Gardens), Village 15B (Siena), Village 16 (The Mesa), Village 18 (The Ridges), Village 19 (Summerlin Centre West), Village 20 (The Vistas), Village 23A/B (The Paseos), and Village 26 (Reverence). All of the villages except Villages 15B, 19, and 26 contained land sold in pad sales.[5] Finished lot sales occurred in Villages 16, 18, 19, 20, and 23.

Also at issue are 279 custom lot contract sales. All custom lot contracts involved the sale of lots in Village 18. Of the custom lot contracts, 94% were entered into and closed in the same tax year. The remaining custom lot contracts closed in the tax year following the one in which they were entered into.

The parties have agreed that Villages 16, 18, 20, and 23 are generally representative of the villages at issue. The parties have also agreed on a BDA that is representative of finished lot sales (Ladera BDA), a BDA that is representative of pad sales (Lyon BDA), and two custom lot contracts, Redhawk and Arrowhead, that are generally representative of the custom lot contracts at issue.

In addition to the pad sales, the finished lot sales, and the custom lot contracts, petitioners also sold villages 15B and 26 in bulk sales essentially equivalent to very large pad sales. Within the boundaries of the property sold in a bulk sale, petitioners do nothing. Rather, the purchaser is responsible for all development. With respect to Village 26, known as Reverence, the first half of the sale to Pulte Homes, Inc., now

---

[4] The parties provided a stipulated exhibit that purports to be a list of BDAs at issue. This list of 130 BDAs includes 23 contracts for sales in Village 14A. But the parties also stipulated that petitioners recognized the gain on BDAs involving Village 14A in 2000. Other stipulated exhibits, such as a map highlighting the villages at issue and the calculations attached to the 30-day letters, also reveal that the contracts for sales of land in Village 14A are not in issue. We disregard the contracts from Village 14A in arriving at the total number of BDAs at issue.

[5] The parties disagreed over whether Villages 18 and 19 contained land sold in pad sales. This dispute is immaterial to our ultimate holding, but we find that the weight of the evidence suggests Village 18 contained land sold in pad sales whereas Village 19 did not.

known as Pulte Group, Inc., occurred in December 2006, just before the 2007 housing market collapse, and neither petitioners nor the purchaser have done any work on this property. In fact, the sale of Village 26 was to occur in two parts, but the purchaser defaulted on the second half of the contract. With bulk sales, petitioners still incurred regional costs that benefit the two villages, such as costs for water lines, regional drainage, and road extensions.

*Common Improvements Generally*

The BDAs, loan agreements, governmental laws, and other legal obligations required petitioners to build common improvements in Summerlin. These improvements included rough grading, roadways, sidewalks, utility infrastructure such as water, sewer, gas, electricity, and telephone, storm water drainage, parks, trails, landscaping, entry features, signs, and perimeter walls. Upon completion of a common improvement, petitioners transferred ownership or granted easements to the respective community association or, where appropriate, the municipality. Generally, community associations received some roads, swimming pools, open spaces, and medians, whereas the municipalities received police stations, fire stations, other roads, traffic signals, and street lights.

Some of these improvements were necessary for construction of the dwelling units. The allocable costs attributable to petitioners' improvement construction activities exceeded 10% of the various total contract prices. Petitioners designed all of the common improvements in an effort to make Summerlin an attractive community. In addition, petitioners monitored and maintained approval control over all construction in Summerlin, including construction of the dwelling units.

*Representative Contracts*

*Finished Lot Sale—Ladera BDA*

With respect to the BDAs, the parties stipulated that these contracts are construction contracts within the meaning of section 460(e)(4). The Ladera BDA is a purchase and sale agreement between HHPI and KB Home Nevada, Inc. (KB Home), for finished lots in Village 16 in a neighborhood called Ladera. The Ladera BDA called for the land sale to be

completed in three phases. Village 16, known as The Mesa, consisted of a mix of residential uses including single family and multifamily units. The style of The Mesa drew its inspiration from the mountains in the backdrop, and petitioners required builders to use natural building materials, such as stone, and to include at least two outdoor living spaces per residence.

In addition to the purchase price, the Ladera BDA entitled HHPI to certain participation payments as well as payments tied to power company refunds. HHPI received a lot premium participation payment equal to 50% of the lot premium less a credit calculated by reference to any commission paid to an unrelated broker. HHPI also received a payment equal to the greater of 3% of the net sale price or HHPI's percentage share, 38% of the net sale price less the finished lot costs.[6] The power company refund payments stemmed from the fact that HHPI paid the Nevada Power Co. to construct electric feeder lines. As homeowners subscribed to electrical service, the power company refunded all or part of the costs. HHPI assigned the rights to the refunds to KB Home but then required KB Home to make three lump-sum payments equal to the estimated amount of the refund.

The Ladera BDA required HHPI to develop the parcel into finished lots. HHPI constructed all of the infrastructure up to the individual lot lines. Thus, wet and dry utilities were "stubbed" to the lot boundaries. HHPI was also responsible for the streets and street improvements such as traffic signals, the driveway depressions, the perimeter and retaining walls, entry monumentation, and landscaping. HHPI also graded the parcel, including the lots. And HHPI agreed to construct a community park with a swimming pool, for which KB Home paid HHPI a community park fee of $2,000 per residence.

Improvement plans governed the work HHPI had to perform as part of the contract. HHPI, through the engineering firm G.C. Wallace, Inc. (GCW), created their plans, one for each phase, for approval by Clark County, the public utilities, and other agencies. The plans governed the curbs, gut-

---

[6] As used in the contracts, net sale price means the gross sale price less credit for any lot premium and any costs of amenities, such as swimming pools. Finished lot costs is the purchase price KB Home paid for the lot.

ters, and other paving improvements, street signs, streetlights, driveway depressions, and wet utilities, such as sewer mains, manholes, water mains, fire hydrants, and water and sewer service stubbed to each lot. Another set of plans prepared by the utility companies governed the dry utilities, such as telephone and gas. In addition, HHPI was responsible for any improvement necessary for the issuance of a building permit or certificate of occupancy and for land-scaping, design, and construction of perimeter and screen walls, entry monumentation, and community open space.

On the purchaser's side, the Ladera BDA obligated KB Home to build dwelling units subject to a development dec-laration and a development plan. The BDA also annexed the property to the Summerlin South Community Association, making KB Home also subject to the CC&Rs of that associa-tion. The development declaration, entered at the time of closing of phase 1, contained a number of additional restric-tions on KB Home. The declaration allowed KB Home to con-struct only single-family homes in accordance with a develop-ment plan. The declaration preserved HHPI's control over design of homes and landscaping by requiring that they con-form to HHPI's residential design criteria for The Mesa Vil-lage and to the landscape standards. The design criteria gov-erned everything from lot grading to home finishes.

The declaration required KB Home to create a develop-ment plan. The development plan had to describe land-scaping improvements as well as building improvements. With respect to the plans for the homes, the declaration required KB Home to create a concept plan, with floor plans and sketches of the home exteriors visible from the street, preliminary and final plot plans, which showed the location of the home and other improvements on the lot, an architec-tural materials sample board, which included samples of the building materials to be used, and a marketing signage plan, which contained details on all signage.

The development plan was subject to the approval of HHPI. If HHPI or a governmental agency disproved or rejected an item as not being in conformity with the develop-ment plan, KB Home was obligated to correct the defect at its own cost. In addition to requiring KB Home to construct single-family homes in a certain manner, the Ladera BDA also required KB Home to construct sidewalks, driveways,

model homes, interior screen walls, curb scribes, and water meters.

*Pad Sale—Lyon BDA*

The second purchase and sale agreement is an example of a pad sale. This agreement was between Old THHC and William Lyon Homes, Inc. (Lyon), for the sale of Parcel M in Village 20. As part of this agreement, THHC transferred fee simple title to Lyon subject to a number of encumbrances, including the Summerlin West Master Declaration, a supplemental declaration of annexation, a development declaration, and the Summerlin West Development Agreement. The agreement limited Lyon to constructing single-family homes.

The agreement also placed substantial restrictions on Lyon's use of the property. The supplemental declaration of annexation subjected Parcel M to the CC&Rs in the Summerlin West Master Declaration and imposed its own restrictions, such as those governing satellite dishes and signs. Similarly, the development declaration required Lyon to submit a development plan for THHC's approval before it could begin any construction. The development declaration also required improvements to conform to an architectural concept plan, a preliminary plot plan, an architectural materials sample board, a final plot plan, a marketing signage plan, and the Summerlin Design Standards. If any item did not conform to the development plan or was otherwise defective, Lyon had to, at its own cost, correct the problem.

The agreement also required Lyon to build entry monumentation and landscaping, a minipark, and pedestrian access ways. The parties agreed to share costs of boundary walls between the property and adjacent parcels if the parties thought such walls were desirable.

THHC, as part of the agreement, agreed to perform all other obligations, except those inuring solely and specifically to the subject property or specifically under the LVDA necessary for the purchaser's project. THHC also agreed to construct the roads bordering the parcel, Vista Run Drive and Trail View Lane, and associated roads, curbs, gutters, and street lighting. The agreement further required petitioners to construct a perimeter boundary wall along the roads bordering the property and to stub the wet and dry utilities to the parcel.

*Custom Lot Contracts*

The parties provided two custom lot contracts for the sale of property in Village 18 to individual purchasers through custom lot contracts. Each custom lot contract involved the sale of a lot(s) in one of seven neighborhoods in Village 18, known as The Ridges. The two representative contracts were for the sale of a lot in the Arrowhead neighborhood and for the sale of a lot in the Redhawk neighborhood. These contracts are representative of the other custom lot contracts at issue in these cases.

Each contract sold a lot described in final maps recorded with the Office of the County Recorder of Clark County, Nevada. The contracts required the purchaser to build a single-family home on the lot. In addition, the contracts stated that HHPI must construct or have constructed certain improvements and the individual lot purchaser is to be solely responsible for other lot improvements. For instance, section 7 of the Arrowhead contract stated in part:

> *HHP's Improvements*. HHP has installed roads providing access to the Lot, together with underground improvements for sanitary sewer, potable water, telephone, natural gas and electric power. All such utility improvements have been stubbed out to the Lot. It shall be Purchaser's responsibility to activate water service * * * prior to commencing construction on the Lot. Purchaser is responsible for all utility connections from the property line to Purchaser's Home and for making all necessary arrangements with each of the public utilities for service. Purchaser acknowledges that HHP is not improving the Lot and has not agreed to improve the Lot for Purchaser except as provided in this Section 7. Purchaser will be responsible for finish grading and preparation of the building pad and acknowledges that HHP has not agreed to provide any grading of the Lot beyond its present condition.

Section 7 of the Redhawk contract was substantially similar, but it implied that HHPI's work was not yet completed at the time of the purchase and sale agreement.

As part of the custom lot contract, HHPI explicitly stated that it "made no representations or warranties concerning zoning * * * or the future development of phases of Arrowhead, The Ridges or the surrounding area or nearby property". A similar provision was in the Redhawk contract. The contracts also contained integration clauses. Paragraph 23 of the representative contracts stated:

> This Agreement constitutes the entire agreement and understanding between Purchaser and HHP with respect to the purchase of the Lot and may not be amended, changed, modified or supplemented except by an instrument in writing signed by both parties. This Agreement supersedes and revokes all prior written and oral understandings between Purchaser and HHP with respect to the Lot.

But the purchasers also initialed a page of the custom lot contracts that states: "ALL OF THE DOCUMENTS LISTED BELOW ARE IMPORTANT TO THE PURCHASE OF THE LOT, SHOULD BE READ BY THE PURCHASER AND, AT THE CLOSE OF ESCROW, SHALL BE DEEMED TO HAVE BEEN READ AND APPROVED BY PURCHASER. * * * PURCHASER HEREBY ACKNOWLEDGES RECEIPT OF COPIES" of those listed documents. Among the documents that purchasers acknowledged receipt of and were deemed to have read are CC&Rs, articles of incorporation, and bylaws of the Summerlin South Community Association, copies of the recorded subdivision map for the neighborhood in which the lot was located, the neighborhood design criteria, and a public offering statement.[7]

The purchasers and the purchased lots were subject to the various CC&Rs that govern Summerlin South, Village 18, and the subassociation within Village 18, and they were contractually required to conform their lot to the relevant architectural declaration. The architectural declaration required that all construction on the lot be approved by HHPI. If HHPI delegated the approval power to a review committee for The Ridges, then that committee must approve the declaration. In addition, the CC&Rs for the Village 18 association granted access to homeowners to their lots by way of one of two circular roadways accessible by two guard houses and private gates, all of which were to be designed and constructed by HHPI, including associated landscaping. These improvements became common elements owned by the community association as did other elements such as entry

_____

[7] The parties did not provide copies of the attachments to the two representative custom lot contracts. Rather, they provided the attachments to a different custom lot contract, which involved the sale of a lot in The Azure community in Village 18. The parties have stipulated that these attachments are generally representative of the exhibits attached to a contract for the purchase and sale of a custom lot in Village 18.

features, recreational facilities, landscaped medians, and cul-de-sacs.

The recorded subdivision maps identified the common areas, including private roads such as Drifting Shadow Way and Sun Glow Lane, which were granted to the relevant community association. These maps also showed the location of storm drain easements and flood control and drainage channel right-of-ways. The neighborhood design criteria contained maps showing the walls and fences HHPI had to construct. The design criteria also contained a map that showed a community and fitness center, which the parties stipulated was available to residents of Village 18. The public offering statements not only stated that the private roads, guard houses, and landscaping improvements are to be owned by the community association, but they also recited that HHPI was responsible for utility connections to the lots and landscaping improvements in common lots.

*Tax Reporting*

For the years at issue, petitioners used the completed contract method of accounting in computing gain or loss from their contracts for sale of residential real property in Summerlin West and South intended for residential buildings planned to contain four or fewer residential units per building.[8] Petitioners reported gain from BDAs, custom lot contracts, and the bulk sale agreements when they incurred 95% of the estimated costs allocable to each BDA, custom lot contract, or bulk sale agreement.

Petitioners broke down estimated BDA costs into three categories: direct village costs, regional costs, and finished lot costs. Direct village costs consisted of the cost for the common improvements that benefit only the village that was the subject matter of the contract. These costs included the following cost categories: planning; engineering; inspection, testing, and processing; rough grading; water/sewer storm drain; street improvements; dry utilities; walls/fencing; landscaping; parks; deposits; other; and contingency. Regional

---

[8] For example, petitioners did not use the completed contract method of accounting to account for gain or loss from the sale of property upon which large multiunit apartment and commercial buildings were ultimately to be built.

costs consisted of common improvements that benefited more than one village and included the following cost categories: regional water, regional sewer, regional drainage, regional roads, regional traffic signals, regional entry features, regional annual costs, regional other costs, and townwide arterial costs. Finished lot costs were the costs that benefit only the neighborhood or parcel in which the finished lots were located.

Petitioners used the engineering firm GCW to calculate most cost estimates. For the actual construction cost categories, the "hard costs", GCW used a market price unit rate for each improvement, which was based on its experience with past bids as well as prevailing bond rates. The unit rate generally reflected labor and materials cost for the relevant improvement. The unit rate was applied differently to different improvements. For instance, GCW applied the unit rate based on length for improvements such as curbs, sewer lines, and sidewalks, on area for improvements such as paving and some landscaping, and on number of units of a designated improvements such as street lights and fire hydrants. "Soft costs", or costs other than the actual construction costs such as engineering, inspection, testing, and processing, were calculated as a percentage of the hard costs.

For regional water costs, GCW allocated the costs to villages according to the percentage of village acreage in the relevant water zone. GCW assigned costs to each water zone for water mains, pump stations, reservoirs, and inlet and outlet pipes in the water zone. For regional sewer costs, GCW allocated the cost among villages in proportion to their acreage. These costs included costs for the sewer systems, including pipes and mains, paving, manholes, flowmeters, and traffic controls. Drainage, regional roads, regional entry features, regional annual, regional other, and townwide arterial costs were all also allocated in proportion to village acreage. Traffic signal costs, however, were allocated to the village(s) adjacent to the street corners (for example, one-fourth to each corner at a four-way intersection) of the relevant signal and then prorated by acreage.

For the finished lot costs, petitioners and GCW used a formula based on historical actual costs. This formula yielded

an estimated incremental cost of improvements of $40,000 per lot.

*Deficiencies*

For the tax years at issue, petitioners reported income from the sale of land within Summerlin using the completed contract method of accounting. Under petitioners' methods of accounting, each BDA, custom lot contract, and bulk sale agreement was a home construction contract, and they were not completed within the meaning of section 460 until petitioners incurred 95% of the direct and indirect costs allocable to the agreement or contract.

Respondent issued notices of deficiency to both petitioners. As part of his determinations, respondent changed petitioners' methods of accounting from the completed contract method of accounting to the percentage of completion method of accounting. Respondent adjusted petitioners' income as follows:

| Petitioner | 2007 | 2008 | Total |
|---|---|---|---|
| THHC | $209,875,725 | $19,399,420 | $229,275,145 |
| HHPI | 156,303,168 | 37,192,046 | 193,495,214 |

The total additional cumulative taxable revenue THHC would have recognized through its 2008 tax year under the percentage of completion method of accounting is $239,897,451. The difference between this number and the total $229,275,145 adjustment in the notice of deficiency is due to adjustments for (1) gain recognized in the 2003 tax year pursuant to a prior audit, (2) overreported gain for nonexempt development activities, and (3) underreported gain for nonexempt development activities.

The total additional cumulative taxable revenue HHPI would have recognized through the 2008 tax year under the percentage of completion method of accounting is $231,791,739. The difference between this number and the total $193,495,214 adjustment in the notice of deficiency is due to (1) gain recognized in the 2003 tax year pursuant to a prior audit, (2) overreported gain for nonexempt development activities, and (3) overreported gain for exempt development activities.

Respondent's adjustments resulted in his determination of the following deficiencies:

| Petitioner | 2007 | 2008 |
| --- | --- | --- |
| THHC | $73,456,504 | $6,789,797 |
| HHPI | 50,633,554 | 13,228,620 |

Petitioners timely petitioned this Court for redetermination, and a trial was held in Las Vegas, Nevada.

OPINION

I. *Burden of Proof*

Generally, the Commissioner's determination of a taxpayer's liability for an income tax deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). If a taxpayer's method of accounting does not clearly reflect income, section 446(b) allows the Commissioner to change the taxpayer's method of accounting to one that does clearly reflect income. The Commissioner is granted broad discretion in determining whether an accounting method clearly reflects income, and that determination is entitled to more than the usual presumption of correctness. *Commissioner v. Hansen*, 360 U.S. 446, 467 (1959); *RECO Indus., Inc. v. Commissioner*, 83 T.C. 912, 920 (1984). The question of whether a particular accounting method clearly reflects income is a question of fact. *Sam W. Emerson Co. v. Commissioner*, 37 T.C. 1063, 1067 (1962).

To prevail, the taxpayer must establish that the Commissioner abused his discretion in changing the method of accounting. *Prabel v. Commissioner*, 91 T.C. 1101, 1112 (1988), *aff'd*, 882 F.2d 820 (3d Cir. 1989). But the Commissioner may not change a taxpayer's method of accounting from an incorrect method to another incorrect method. *Id.* Nor may the Commissioner change a taxpayer's method of accounting "[w]here a taxpayer's method of accounting is clearly an acceptable method" and clearly reflects income. *Id.*

II. *Custom Lot Contracts and Bulk Sale Agreements as Long-Term Contracts*

First, we must determine whether petitioners' contracts are long-term contracts. The parties stipulated that the BDAs are long-term construction contracts. The notices of deficiency determined deficiencies as if all of petitioners' contracts were long-term contracts. On brief respondent has departed from that determination and contends that the custom lot contracts and the bulk sale agreements are not long-term contracts. Generally, the Court will not allow a party to raise an issue on brief if consideration of that issue would surprise and prejudice the opposing party. *Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 349 (2013). Because we do not think that petitioners need additional evidence to respond to the new issue and respondent has not carried the issue, we address it below. *See id.* (looking to "the degree to which the opposing party is surprised by the new issue and the opposing party's need for additional evidence to respond to the new issue" to determine prejudice). As to new issues, respondent bears the burden of proof. *See* Rule 142(a)(1).

A. *Custom Lot Contracts*

Respondent alleges that none of petitioners' custom lot contracts qualify even for accounting under the percentage of completion method because they are not long-term contracts. Initially, respondent contends that many of the contracts were entered into and closed within the same tax year and they therefore cannot be considered long term within the meaning of section 460. Second, respondent contends that because petitioners did not have a legal obligation to perform the construction activities contemplated by the contracts, the contracts are not construction contracts. Petitioners, on the other hand, first assert that the contracts are complete, for the purposes of section 460, when they incur at least 95% of the total allocable contract costs attributable to the contract's subject matter. They also contend that their contracts are construction contracts that impose legal obligations upon them.

A long-term contract is "any contract for the manufacture, building, installation, or construction of property if such contract is not completed within the taxable year in which such

contract is entered into." Sec. 460(f)(1). The relevant regulation provides that the date a contract is completed is the earlier of

> (A) Use of the subject matter of the contract by the customer for its intended purpose (other than for testing) and at least 95 percent of the total allocable contract costs attributable to the subject matter have been incurred by the taxpayer; or
> (B) Final completion and acceptance of the subject matter of the contract.
> [Sec. 1.460–1(c)(3)(i), Income Tax Regs.]

But taxpayers determine the contract completion date "without regard to whether one or more secondary items have been used or finally completed and accepted." Sec. 1.460–1(c)(3)(ii), Income Tax Regs. In addition, the regulation directs taxpayers to "consider all relevant facts and circumstances" in determining whether final completion and acceptance has occurred. Sec. 1.460–1(c)(3)(iv), Income Tax Regs.

If the subject matter of the custom lot contracts is solely the sale of the piece of land, then petitioners' custom lot contracts would be complete upon close of escrow. The custom lot contracts do indeed provide for the sale of a piece of land, but they also reference numerous other documents, including CC&Rs, development plans, and subdivision maps. Under Nevada law, "'[w]ritings which are made a part of the contract by annexation or reference will be so construed; but where the reference to another writing is made for a particular and specified purpose, such other writing becomes a part for such specified purpose only.'" *Lincoln Welding Works, Inc. v. Ramirez*, 647 P.2d 381, 383 (Nev. 1982) (quoting *Orleans M. Co. v. Le Champ M. Co.*, 284 P. 307 (Nev. 1930)). However, if the reference "indicates an intention to incorporate * * * [the documents] generally, such reference becomes a part of the contract for all purposes." *Id.*

The custom lot contracts contain a page whereon the purchaser(s) acknowledge receipt of copies of numerous documents, which are listed on the page.[9] We believe that this

---

[9] As previously noted, the page reads in part: "ALL OF THE DOCUMENTS LISTED BELOW ARE IMPORTANT TO THE PURCHASE OF THE LOT, SHOULD BE READ BY THE PURCHASER AND, AT THE CLOSE OF ESCROW, SHALL BE DEEMED TO HAVE BEEN READ

sentence incorporates the documents listed, and, because there is no indication that the reference is for a specific purpose, we incorporate these documents generally.

After reviewing the custom lot contracts, the documents referenced therein, and the testimony regarding Summerlin as a master-planned community marketed as such by petitioners, we are convinced that the subject matter of the contracts encompasses more than just the sale of the lot. The costs incurred for a custom lot contract are not really different from the costs for the finished lot sales. At the time of trial, petitioners still had to complete a water service line, traffic signals, landscaping, and construction of a park. Therefore, we agree that final completion and acceptance does not necessarily occur at the close of escrow, but rather occurs when final completion and acceptance of the subject matter of the contracts, which includes improvements whose costs are allocable to the custom lot contracts, occurs. *Cf. Shea Homes, Inc. & Subs. v. Commissioner*, 142 T.C. 60, 104 (2014). Consequently, petitioners are entitled to account for the gain or loss from these contracts on the appropriate long-term method of accounting under section 460 to the extent the contracts are not completed within the taxable year in which they are entered into.

In so holding, we reject respondent's contention that the contracts impose upon petitioners no separate legal obligation to complete the required improvements. The regulations provide that a contract is a long-term contract under section 460 "if the manufacture, building, installation, or construction of property is necessary for the taxpayer's contractual obligations to be fulfilled and if the manufacture, building, installation, or construction of that property has not been completed when the parties enter into the contract" and the contract is not completed within the contracting year. Sec. 1.460–1(b)(1) and (2)(i), Income Tax Regs.; *see also Foothill Ranch Co. P'ship v. Commissioner*, 110 T.C. 94, 98–99 (1998).

For contracts that provide for the provision of land, the regulations also contain a de minimis rule, under which if the allocable costs attributable to construction activities do not exceed 10% of the total contract price, the contract is not a construction contract under section 460. Sec. 1.460–

AND APPROVED BY PURCHASER."

1(b)(2)(ii), Income Tax Regs. To calculate the allocable costs, the regulation allows a taxpayer to "include a proportionate share of the estimated cost of any common improvement that benefits the subject matter of the contract if the taxpayer is contractually obligated, or required by law, to construct the common improvement." *Id.* Petitioners' allocable costs attributable to construction activities exceed the 10% threshold. Respondent appears to read this regulation as requiring a taxpayer to have a legal obligation independent of any other preexisting duty.

While we agree with respondent that work completed by petitioners at the time the contracts are entered into cannot transform a contract into a construction contract under section 460, we disagree that the statute and the regulations necessarily require that all construction activity obligations be solely enforceable because of the contract. Respondent believes that section 1.460–1(b)(2)(i), Income Tax Regs., codifies the common law preexisting duty doctrine. Therefore, he says that because petitioners are already obligated by statute to complete various improvements, the obligations are not contractual obligations.

The preexisting duty rule states that "a promise to do that which the promisor is already legally obligated to do is unenforceable." *Johnson v. Seacor Marine Corp.*, 404 F.3d 871, 875 (5th Cir. 2005). Nevada follows the preexisting duty rule. *Cnty. of Clark v. Bonanza No. 1*, 615 P.2d 939, 944 (Nev. 1980). The Nevada Common-Interest Ownership Act requires sellers, such as petitioners, to complete all improvements depicted on any site plan or similar documents except those labeled "NEED NOT BE BUILT", Nev. Rev. Stat. sec. 116.4119(1) (1991), and provides purchasers with a cause of action, *id.* sec. 116.4117 (1997). [10]

It is not clear that the preexisting duty rule applies in these cases. The contracts between petitioners and the purchasers are valid contracts with valid consideration independent of the duties with respect to the development. Second, while the Nevada statute does indeed seem to grant

---

[10] We note that Nev. Rev. Stat. sec. 116.4117 (1997) has been amended numerous times since it was enacted in 1991. We refer to the statute as amended and in effect for the years in which the contracts were entered into.

purchasers a cause of action if petitioners fail to construct improvements as shown on site plans or plats, the statute explicitly provides: "The civil remedy provided by this section is in addition to, and not exclusive of, any other available remedy or penalty." *Id.* sec. 116.4117(5). Therefore, it is uncertain whether a Nevada court would apply the pre-existing duty rule to petitioners' contracts. *See Johnson*, 404 F.3d at 875 ("[A]s long as the contracting parties gain some legally enforceable right as a result of the contract which they previously did not have, consideration is present[.]"). The public policy concerns that underpin the preexisting duty rule do not seem to be present here. [11]

In addition, we do not agree with respondent that section 1.460–1(b)(2), Income Tax Regs., codifies the preexisting duty rule. The regulation clearly states that "how the parties characterize their agreement (e.g., as a contract for the sale of property) is not relevant" in determining the existence of a section 460 construction contract. Sec. 1.460–1(b)(2)(i), Income Tax Regs.; *see also Koch Indus., Inc. & Subs. v. United States*, 603 F.3d 816, 822 (10th Cir. 2010) (citing the regulation). As to the allocable costs attributable to common improvements in the de minimis rule, the regulation does not require that the obligation be solely contractual. Sec. 1.460–1(b)(2)(ii), Income Tax Regs. Rather, the regulation allows a taxpayer to include the allocable costs "if the taxpayer is contractually obligated, or required by law, to construct the common improvement." *Id.* Nothing in the regulation requires that the contract be the sole source of the obligation, and, in fact, it indicates the opposite—that the obligation may be noncontractual.

### B. *Bulk Sale Contracts*

Respondent similarly contends that the bulk sale contracts do not qualify as long-term construction contracts under section 460. Specifically, respondent alleges that petitioners have not established that they were obligated to construct anything under these contracts. Respondent bases this posi-

---

[11] In fact, the Nevada Common-Interest Ownership Act appears to enable parties other than those in contractual privity with the developer to have standing to institute a lawsuit. *See* Nev. Rev. Stat. sec. 116.4117(2) (allowing suit to be brought by a unit's owner, not just the original purchaser of the land from the developer).

tion on his belief that the terms of the bulk sale contracts are unknown and that petitioners failed to carry their burden of proving that the contracts are entitled to a long-term contract method of accounting.

We disagree that the bulk sale contracts are substantially different from the pad sale BDAs. The parties stipulated that the pad sale BDAs are construction contracts. The bulk sale agreements are merely pad sale BDAs on a larger scale. The record supports this conclusion. We heard credible testimony from the vice president of finance for petitioners that the bulk sale contracts were BDAs and that petitioners were obligated to build the same types of common improvements that benefited the property sold, such as regional water lines, traffic signals, and detention basins. Thus, we hold that these contracts too are construction contracts that may be accounted for under section 460 as long-term contracts to the extent consistent with this Opinion.

## III. *Completed Contract Method of Accounting*

Because the Court has concluded that all of petitioners' contracts are long-term construction contracts, we turn to the question of whether the contracts are home construction contracts. Section 460(a) provides generally that taxpayers must determine taxable income from long-term contracts under the percentage of completion method of accounting. Under this method of accounting, taxpayers generally recognize gain or loss throughout the duration of the contract. *See* sec. 1.460–4(b), Income Tax Regs. (rules concerning percentage of completion method). But in some instances taxpayers may account for income from certain construction contracts under other methods of accounting such as the completed contract method. Sec. 460(e).

This section provides an exception to the percentage of completion method of accounting for home construction contracts and an exception for other construction contracts where the taxpayers complete the contract within 24 months and meet a gross receipts test. Sec. 460(e)(1)(A) and (B). The parties have stipulated that most of petitioners' contracts are construction contracts as defined in section 460(e)(4). Petitioners do not contend that they qualify for the second excep-

tion, so the question before us is whether petitioners' contracts qualify as home construction contracts.

Deferral of income tax, like exemptions and deductions, is a matter of legislative grace, and exceptions to the normal income recognition rules must be strictly construed. *See, e.g.*, *Bingler v. Johnson*, 394 U.S. 741, 752 (1969) ("[E]xemptions from taxation are to be construed narrowly[.]"); *Estate of Bell v. Commissioner*, 928 F.2d 901, 903 (9th Cir. 1991) ("The deferral [of estate tax payment] benefits of section 6166 are a 'matter of legislative grace' that is similar to the benefits conferred by other statutory provisions dealing with deductions, exemptions and exclusions from tax. Thus, a strict and narrow construction should be applied to the deferral benefit provisions[.]"), *aff'g* 92 T.C. 714 (1989).

The parties disagree over whether contracts such as petitioners', where the seller does not build the house or any improvements on the lot, qualify as home construction contracts. Section 460(e)(6) defines a home construction contract as follows:

> (A) HOME CONSTRUCTION CONTRACT.—The term "home construction contract" means any construction contract if 80 percent or more of the estimated total contract costs (as of the close of the taxable year in which the contract was entered into) are reasonably expected to be attributable to activities referred to in paragraph (4) with respect to—
>> (i) dwelling units (as defined in section 168(e)(2)(A)(ii)) contained in buildings containing 4 or fewer dwelling units (as so defined), and
>> (ii) improvements to real property directly related to such dwelling units and located on the site of such dwelling units.
>
> For purposes of clause (i), each townhouse or rowhouse shall be treated as a separate building.

We refer to this definition as the 80% test. Paragraph (4) referred to by section 460(e)(6)(A) provides: "For purposes of this subsection, the term 'construction contract' means any contract for the building, construction, reconstruction, or rehabilitation of, or the installation of any integral component to, or improvements of, real property." Sec. 460(e)(4). The statute defines dwelling unit by cross-reference as "a house or apartment used to provide living accommodations in a building or structure, but does not include a unit in a hotel, motel, or other establishment more than one-half of the units in which are used on a transient basis". Sec.

168(e)(2)(A)(ii).[12] The parties do not dispute that pursuant to the contracts, agreements, and government development rules, the structures to be ultimately built upon the land petitioners sell in the contracts at issue are dwelling units.

Importantly, however, petitioners did not build homes on the land they sold, nor did qualifying dwelling units exist on the sold land at the time of the sales. Petitioners have not established that at the time of each sale qualifying dwelling units would ever be built on the sold land. The bulk sale agreement for Village 26 is especially troubling as no construction had yet occurred years later and, because the purchaser-builder defaulted on the contract, THHC still owned half of the village. As far as we know, no qualifying dwelling units will ever be built on these lands,[13] and

---

[12] The relevant regulation largely follows the statute. It defines home construction contracts as follows:

  (i) In general.—A long-term construction contract is a *home construction contract* if a taxpayer (including a subcontractor working for a general contractor) reasonably expects to attribute 80 percent or more of the estimated total allocable contract costs (including the cost of land, materials, and services), determined as of the close of the contracting year, to the construction of—

  (A) Dwelling units, as defined in section 168(e)(2)(A)(ii)(I), contained in buildings containing 4 or fewer dwelling units (including buildings with 4 or fewer dwelling units that also have commercial units); and

  (B) Improvements to real property directly related to, and located at the site of, the dwelling units.

  (ii) Townhouses and rowhouses.—Each townhouse or rowhouse is a separate building.

  (iii) Common improvements.—A taxpayer includes in the cost of the dwelling units their allocable share of the cost that the taxpayer reasonably expects to incur for any common improvements (e.g., sewers, roads, clubhouses) that benefit the dwelling units and that the taxpayer is contractually obligated, or required by law, to construct within the tract or tracts of land that contain the dwelling units.

  [Sec. 1.460–3(b)(2), Income Tax Regs.]

[13] We note that in a case of an insolvent builder, a bankruptcy court may direct the trustee of the bankruptcy estate to petition the local government for rezoning. *See In re Lloyd*, 37 F.3d 271, 274 (7th Cir. 1994) (affirming the bankruptcy court's direction to the trustee to seek to rezone property from agricultural to residential to allow the debtor a homestead exemption). We also note that the Summerlin West and the Summerlin South development agreements with Las Vegas and Clark County have been amended from time to time by the parties. Thus, contractual promises or obligations of third parties alone are, at least in this factual context, insuf-

deferral of income from contracts that might not ever result in qualifying dwelling units seems entirely inappropriate under these circumstances. *Cf. Shea Homes, Inc. & Subs. v. Commissioner*, 142 T.C. at 105–106 (permitting deferral of income from contracts where the completed qualifying dwelling units were, themselves, included in the property being sold and giving rise to the asserted taxable income). Petitioners close the contracts and receive revenue without needing to build a single home. In *Shea Homes*, the taxpayers closed their contracts only after a certificate of occupancy had been issued and simultaneously with the purchasers' taking possession of their house. *Id.* at 79. Petitioners are under no contractual obligation to build homes as their contracts are merely for the sale of land, developed to varying degrees, to builders or individual customers who may eventually build homes on that land.

In respondent's mind, the definitions foreclose petitioners from using the completed contract method of accounting. Only the section 460(e)(4) costs directly associated with building the actual house or improvements thereto qualify for purposes of meeting the 80% test. Petitioners assert that construction activity costs count in meeting the 80% test even though they do not build the four walls or roof of a dwelling unit. Under their interpretation, the "allocable costs" include the costs of required infrastructure and common improvements attributable to the dwelling units. Even if true, this point, without more, would not be determinative of their right to use section 460(e).

The starting point for interpreting a statute or a regulation is its plain and ordinary meaning unless such an interpretation "would produce absurd or unreasonable results". *Union Carbide Corp. v. Commissioner*, 110 T.C. 375, 384 (1998). Undefined words take their "ordinary, contemporary,

---

ficient to ensure that qualifying dwelling units will in fact be constructed on the sold land. When it comes to yet-to-be completed common improvements, presumably bonds are posted, whereas the purchasers of the land do not post or purchase bonds promising construction of homes. We cannot therefore conclude that governmental zoning and entitlement agreements and land sale contracts alone are enough to meet petitioners' evidentiary burden of establishing that the qualifying dwelling units requirement of sec. 460(e)(6)(A) is or will be met.

common meaning". *Hewlett-Packard Co. & Consol. Subs. v. Commissioner*, 139 T.C. 255, 264 (2012).

A. *Costs Attributable to Dwelling Units*

Section 460(e)(6) defines a home construction contract, as of the end of the taxable year when the contract was entered into, by reference to the estimated total contract costs attributable to construction activity "with respect to" (i) dwelling units and (ii) improvements to real property directly related to the units and located on the site of the dwelling units. The regulations clarify that the allocable contract costs to be included in the 80% test must be attributable to the construction of the units and the improvements thereto. Sec. 1.460–3(b)(2)(i), Income Tax Regs. [14]

What does the statute mean when it says "attributable to" construction activities "with respect to" dwelling units and improvements directly related to real property? Sec. 460(e)(6)(A). Respondent asserts that only costs incurred in the actual construction of the dwelling units or their related real property improvements count. Respondent contends that the home construction contract exception requires the taxpayer to build dwelling units or to build improvements to real property directly related to and located on the site of such dwelling units.

Petitioners claim the statute contemplates a broader definition of home construction costs. Under their interpretation, they believe that their costs benefit dwelling units and real property improvements related to and located on the site of such dwelling units. Because the costs benefit dwelling units, petitioners contend that the costs are therefore attributable to the dwelling units and that these costs should count towards meeting the 80% test. Under petitioners' view, because all of their development costs are attributable to construction activity with respect to dwelling units and real property improvements related to and located on the site of

---

[14] Petitioners do not challenge the regulations, and accordingly we give them their due deference. *See* sec. 460(h); *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 55–56 (2011) (applying to regulations the test announced in *Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–843 (1984)); *cf. Shea Homes, Inc. & Subs. v. Commissioner*, 142 T.C.60, 98 n.18 (2014).

those dwelling units, section 460(e) is applicable even though they do not construct the dwelling units.

Petitioners assert that because the costs are allocable to the contracts and because the costs benefit the property sold to the homebuilders and ultimately to individual buyers, the costs are attributable to construction activities with respect to the dwelling units or real property improvements. This conclusion follows, according to petitioners, because the statute does not confine the availability of the completed contract method of accounting to those taxpayers who build the dwelling units' "sticks and bricks" and/or real property improvements related to and located on the dwelling units' lots.

Petitioners' interpretation of the statute would make any construction cost tangentially related to a dwelling unit or real property improvement related to and located on the site of the dwelling unit a cost to be counted in determining whether a contract is a home construction contract. Without petitioners' development work, the pads and lots would be mere patches of land in a desert. Petitioners' work may indeed be necessary for the ultimate home to feasibly be built and occupied.

But these correlations do not mean that those costs are necessarily incurred "with respect to" qualifying dwelling units. "With respect to" implies a stronger proximate causation than petitioners' interpretation permits. The prepositional phrase "with respect to" can mean "as regards: insofar as concerns: with reference to". Webster's Third New International Dictionary 1934 (2002). So the construction activities that count towards meeting the 80% test are defined by reference to the dwelling unit. The phrase does not imply a correlation as loose as proposed by petitioners, nor does it encompass real property improvement activities that are merely related to land which at some indeterminate future time may perhaps become the site of a qualified dwelling unit(s). Consequently, petitioners have failed to establish that such construction costs are incurred with respect to qualifying dwelling units.

At most the statute is ambiguous, and we look to section 1.460–3(b)(2)(i), Income Tax Regs., which clarifies the statute. "Attribute" as used in the regulation means "to explain as caused or brought about by: regard as occurring

in consequence of or on account of". Webster's Third New International Dictionary 142. The word implies causation, and as used in the regulation, the plain meaning of "attribute to" is "caused by".[15] None of these costs, in our view, are attributable to the construction of the dwelling units, because petitioners do not intend to build such units and neither the units nor the real property improvements related to *and located on the site of* the dwelling units have yet been built. The regulation is reasonable, and we conclude it forecloses petitioners' interpretation. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–843 (1984).

Congress added the exception for home construction contracts in 1988. Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. No. 100–647, sec. 5041, 102 Stat. at 3673. Senator Dennis DeConcini and Representative Richard T. Schulze were concerned that homebuilders would have to recognize income not yet received and that costs would no longer match revenues. 134 Cong. Rec. 20722–20723 (Aug. 5, 1988) (Sen. DeConcini); 134 Cong. Rec. 29962–29963 (Oct. 12, 1988) (Sen. DeConcini); 134 Cong. Rec. 20202 (Aug. 3, 1988) (Rep. Schulze). While the conference report is ultimately silent as to why the exception was added in its final form, it is clear that the intended beneficiaries of this relief measure were taxpayers involved in "the building, construction, reconstruction, or rehabilitation of" a home and not land developers who do not build homes, even if essential development work paves the way for, and thus facilitates, home construction. TAMRA sec. 5041.[16]

---

[15] *Cf. Lawinger v. Commissioner*, 103 T.C. 428, 435 (1994) (discussing the definition of "attributable to" in the context of sec. 117(m) of the Internal Revenue Code of 1954 and sec. 108(g)(2)(B) of the Internal Revenue Code of 1986).

[16] The Congressional Record reveals that Chairman Rostenkowski of the House Ways and Means Committee, when moving to suspend the rules so that the House could adopt the Conference Committee Report on H.R. 4333, stated that the conference report exempted "single family homebuilders from the provision" that restricted the completed contract method of accounting. 134 Cong. Rec. 33112 (Oct. 21, 1988). Likewise, Representative Archer, the ranking House conference committee member, stated in support of the conference report: "I was particularly pleased that we changed the 'completed contract method of accounting' provisions under current law to exempt single family residential construction—thereby

That Congress changed the wording of section 460(e)(4) from "reasonably expected to be attributable to the building, construction, reconstruction, or rehabilitation of" to "reasonably expected to be attributable to activities referred to in paragraph (4)" only confirms our view. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101–239, sec. 7815(e)(1)(A) and (B), 103 Stat. at 2419. This change added "the installation of any integral component to, or improvements of, real property" to the list of construction activity. *Id.* The purpose of this change was to ensure that costs incurred in installing integral components such as heating or air conditioning systems were qualifying costs. H.R. Rept. No. 101–247, at 1411 (1989), 1989 U.S.C.C.A.N. 1906, 2881; Staff of J. Comm. on Taxation, Description of Technical Corrections Proposed to the Technical and Miscellaneous Revenue Act of 1988, The Revenue Act of 1987, and Certain Other Pension-Related Tax Legislation 4 (J. Comm. Print 1989). [17] Congress intended to extend this relief provision only to taxpayers who have some direct dwelling construction costs, as defined in section 460(e)(4).

In summary, the terms "with respect to", sec. 460(e)(6)(A), or "attribute * * * to", sec. 1.460–3(b)(2)(i), Income Tax Regs., do not qualify contracts as home construction contracts when petitioners do not construct the home, prove that a qualifying dwelling unit was built, or, in the case of pad and bulk sales, even develop the immediate neighborhood. We do not agree with petitioners' assertion that the term "dwelling units" encompasses more than the home. Petitioners urge us not to confine "dwelling unit" to the structure built on the lot and would instead have that term encompass all the relevant infrastructure that makes the unit suitable for habitation. The regulations clarify this point by providing a separate relief provision for such common improvements. Sec. 1.460–3(b)(2)(B)(iii), Income Tax Regs. We recognize the potential tension with our Opinion in *Shea Homes*, and we address such concerns *infra*.

---

reducing the cost of homes." *Id.*

[17] We cite the Joint Committee on Taxation's report for its persuasive merit. *See United States v. Woods*, 571 U.S. ____, ____, 134 S. Ct. 557, 568 (2013).

B. *Section 406(e)(6)(A)(ii) Real Property Improvements*

We disagree with petitioners that the statute allows their construction activity costs to qualify because they are related to and located on the site of the dwelling units. "Site", according to petitioners, means Summerlin, not the individual lot on which a house is later built. Petitioners reason that because the statute uses the plural of dwelling unit—"on the site of such dwelling units"—but does not use the plural of "site", then the statute necessarily envisions a development, like Summerlin, containing multiple dwelling units and requires that a site be more than the lot upon which the dwelling unit is built. Be that as it may, this argument is not controlling here because it ignores the fact that the statute allows a construction contract for a building with four or fewer dwelling units to still be considered a home construction contract. Sec. 460(e)(6)(A)(i). Such a building would necessarily consist of dwelling units (plural), but would sit on a single site.

Petitioners read the preposition "on" in the phrase "on the site" to connote proximity. Indeed, "on" can be used to indicate contiguity. Webster's Third New International Dictionary 1574 ("location closely adjoining something"). But "on" is also used "to indicate position over and in contact with that which supports from beneath". *Id.* By using the phrase "at the site" in the regulations, respondent did not necessarily interpret "on" to indicate proximity rather than the narrower usage. While "at" can be used "to indicate presence in, on, or near", *id.* at 136, we do not think that in choosing the word "at", as opposed to a phrase like "on or nearby", the regulation intended to interpret "on the site" broadly.

Even if we were to view the statute as ambiguous in its use of "on the site of", the Secretary has resolved any ambiguity through regulatory gap-filling. And we are required to defer to an agency's permissible interpretation of an ambiguous statute. *Chevron U.S.A., Inc.*, 467 U.S. at 842–843.

The Secretary believed that the statutory phrase might prevent taxpayers from counting the costs of common improvements towards the 80% test, and as a result many large homebuilders might be unable to qualify for the completed contract method of accounting for home construction

contracts. He rightly ameliorated this problem by adopting section 1.460–3(b)(2)(B)(iii), Income Tax Regs., which allows taxpayers to count such costs as part of the cost of building dwelling units for the purposes of the 80% test. The regulation reflects a permissible—inescapable in our minds—construction of the statute, and we defer to that construction. *See id.* [18]

The costs petitioners incur are, if anything, common improvement costs as defined in section 1.460–3(b)(2)(iii), Income Tax Regs. The regulations make clear that taxpayers may include the allocable share of these common improvement costs in the cost of the dwelling units. *Id.* But we agree with respondent that the taxpayer must at some point incur some construction cost with respect to the dwelling unit to include these costs in the dwelling unit cost. We do not believe that section 1.460–3(b)(2)(i) and (iii), Income Tax Regs., allows a taxpayer with zero direct construction costs with respect to dwelling units to simply add common improvement costs for the purposes of the 80% test. Rather, the regulation states that the taxpayer may "include" such costs. Sec. 1.460–3(b)(2)(iii), Income Tax Regs. The regulation allows the taxpayer to include only the share of the common improvement costs allocable to the dwelling unit. *Id.* If the taxpayer does not construct or intend to construct qualified dwelling units, there is no allocable share of common improvement costs.

---

[18] In addition, the legislative history supports our interpretation of "site" as limited to the site of the home. The conference committee report states:

> [A] contract is a home construction contract if 80 percent or more of the estimated total costs to be incurred under the contract are reasonably expected to be attributable to the building, construction, reconstruction, or rehabilitation of, or improvements to real property directly related to and located on the site of, dwelling units *in a building* with four or fewer dwelling units. * * * [H.R. Conf. Rept. No. 100–1104 (Vol. II), at 118 (1988), 1988–3 C.B. 473, 608; emphasis added.]

This sentence clearly shows that Congress used "dwelling units" in the plural as opposed to the singular in sec. 460(e)(6)(A)(ii) because a construction contract for a building with four or fewer dwelling units could qualify as a home construction contract. Congress did not intend the plural to expand the definition of "site" from the geographic limitations of the immediate lot to the geographic boundaries, and even beyond, of the whole development.

Petitioners have no dwelling unit costs in which to include the common improvement costs. The costs petitioners incur are not the actual homes' structural, physical construction costs. Nor are they costs for improvements "located on" or "located at" the site of the homes. Therefore, petitioners may not include these costs in testing whether 80% of their allocable contract costs are attributable to the dwelling units and real property improvements directly related to and located on the site of the yet to be constructed dwelling units.

After reviewing the plain and ordinary meaning of the statute and the regulation, we conclude that petitioners' contracts and agreements do not qualify as home construction contracts.[19] Recently, we held that availability to home-

_____

[19] We also do not think that respondent's current position is inconsistent with the Internal Revenue Service (IRS) material petitioners cite. For instance, the IRS Non-Docketed Service Advice Review they referenced does not say that a home construction contract need not involve the building of a home. 2003 IRS Non-Docketed Service Advice Review 20006 (Jan. 18, 2003). Rather this document states that the activities enumerated by sec. 460(e)(4) encompass more than just building a house, such as rehabilitating a home or installing integral components. *Id.* As mentioned *supra*, when Congress changed sec. 460(e)(6) to reference para. (4), thereby including "the installation of any integral component to, or improvement of, real property" in the qualifying costs of sec. 460(e)(6), it intended to allow taxpayers who build components such as air conditioning and heating systems to potentially qualify their construction contracts as home construction contracts. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101–239, sec. 7815(e)(1)(A), 103 Stat. at 2419; H.R. Rept. No. 101–247, at 1411 (1989), 1989 U.S.C.C.A.N. 1906, 2881. For an explication of the IRS' current position, see Tech. Adv. Mem. 200552012 (Dec. 30, 2005), indicating that the IRS believes the home construction exception is only available to the party who actually builds or produces a dwelling unit. Consequently, a land developer who did not build any dwelling unit(s) could not qualify.

We recognize that the proposed regulations, which would redesignate sec. 1.460–3(b)(2)(iii), Income Tax Regs., as sec. 1.460–3(b)(2)(iv), if adopted, would expand the scope of the qualifying costs. Proposed Income Tax Regs., 73 Fed. Reg. 45182 (Aug. 4, 2008). These regulations would modify the definition of "improvements to real property directly related to, and located on the site of, the dwelling units" by including costs of common improvements within that definition even if the contract does not provide for the construction of any dwelling unit(s). *Id.* Not only does the preamble to the proposed regulations explicitly caution taxpayers not to rely on these regulations, *id.* at 45181, but by negative inference they add credence to our view that petitioners' position is unsupported by the wording of the current statute and regulation.

builders of the completed contract method of accounting is "generously broad and reflects a deliberate choice by Congress that home construction contracts should be treated differently", but only as to homebuilders. *Shea Homes, Inc. & Subs. v. Commissioner*, 142 T.C. at 107–108. As for other construction contracts, "[t]he completed contract method of accounting is a narrow exception to the legislated rule that most long-term contracts must now be accounted for under the percentage of completion method of accounting", which should be strictly construed. *Id.* at 107. Petitioners were not homebuilders, and their contracts were not home construction contracts. Petitioners cannot account for gain or loss from these contracts using the completed contract method of accounting.

## C. *Shea Homes*

In *Shea Homes*, we held that the subject matter of the home construction contracts of the taxpayers, developers who both developed land and built homes, included the home, the lot on which the home sat, and the common improvements and amenities. Therefore, we held that in testing contract completion, the taxpayers were entitled to apply the use and 95% completion test by using the contract costs, after including the allocable share of the costs of the common improvements and amenities of the development or development phase which included the dwelling unit(s).

In reaching this conclusion, we looked in part at the definition of home construction contract to inform our understanding of the regulation's use of "subject matter" of the contract. We concluded that section 460(e)(6)(A) defined a home construction contract, and that "the regulations expand this definition to allow taxpayers to include 'the allocable share of the cost that the taxpayer reasonably expects to incur for any common improvement.'" *Shea Homes, Inc. & Subs. v. Commissioner*, 142 T.C. at 102 (quoting section 1.460–3(b)(2)(iii), Income Tax Regs.). We believed that the fact that the regulations expanded the universe of costs to be considered when deciding whether a contract qualified as a home construction contract was "at minimum instructive" when deciding when that contract is subsequently completed.

But at no point in *Shea Homes* did we say that a home construction contract could consist solely of common improve-

ment costs. The starting point in *Shea Homes* was that the taxpayers' contracts were for the construction of qualifying dwelling units. Those taxpayers developed land and built homes, and so when testing whether their contracts were home construction contracts, they were permitted by the regulations to add to the costs of the dwelling units they constructed their common improvement costs. And, when testing the contract completion date, they looked to when they incurred 95% of the costs of the subject matter of the contract.

Our Opinion today draws a bright line. A taxpayer's contract can qualify as a home construction contract only if the taxpayer builds, constructs, reconstructs, rehabilitates, or installs integral components to dwelling units or real property improvements directly related to and located on the site of such dwelling units. It is not enough for the taxpayer to merely pave the road leading to the home, though that may be necessary to the ultimate sale and use of a home. If we allow taxpayers who have construction costs that merely benefit a home that may or may not be built, to use the completed contract method of accounting, then there is no telling how attenuated the costs may be and how long deferral of income may last. We cautioned in a footnote in *Shea Homes, Inc. & Subs. v. Commissioner*, 142 T.C. at 109 n.24, that there is a temporal component to the home construction contract exception and contract completion.[20] We think it consistent with congressional intent that a line should be drawn here so as to exclude petitioners' contracts, when we cannot conclude that qualifying dwelling units will ever be built.

---

[20] The regulations caution that "taxpayers may not delay the completion of a contract for the principal purpose of deferring federal income tax." Sec. 1.460–1(c)(3)(iv)(A), Income Tax Regs. In these cases, petitioners would often build infrastructure as needed. For instance, the costs of a road or a water line that is anticipated to benefit a village may upon request, *see supra* p. 364, not be incurred for many years. This may lead to a situation where the contract completion date could be substantially delayed. We do not suggest that developers intentionally build ghost towns by building out infrastructure in excess of demand, but we suggest that such costs would not necessarily be a proper part of a home construction contract. This is especially important for contracts qualifying for the completed contract method of accounting where such a delay coupled with just-in-time, as-needed improvements construction indeterminately defer recognition of income.

Of course, the contract does not necessarily have to be for the actual sale of a home. The regulations make clear that a subcontractor's contract may qualify as a home construction contract. For instance, a subcontractor who does the electrical work inside the home may have a home construction contract. Petitioners attempt to characterize their relationship with the homebuilders as a general contract or subcontractor relationship. In an interesting and innovative twist, petitioners try to characterize themselves as the subcontractor in the relationship, as if the builders are subcontracting out all of this infrastructure and extra-home development work to petitioners. But this is not the relationship the parties have chosen. *See Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) ("[W]hile a taxpayer is free to organize his affairs as he so chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." (Citations omitted.)).

IV. *Conclusion*

Petitioners' contracts are not home construction contracts within the meaning of section 460(e). Petitioners may not account for these contracts using the completed contract method of accounting. The custom lot contracts and the bulk sale agreements are, however, long-term construction contracts for which petitioners, if those contracts are entered into in a year before their completion, may use a permissible method of accounting for long-term contracts, such as the percentage of completion method.

The Court has considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, the Court concludes that they are moot, irrelevant, or without merit.

*Decisions will be entered for respondent*.