**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 27, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KOCH INDUSTRIES, INC. AND
SUBSIDIARIES,

        Plaintiff - Appellee,

v.

UNITED STATES OF AMERICA,

        Defendant - Appellant.

No. 08-3347

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 6:06-CV-01049-JTM-KMH)**

---

Ellen Page DelSole, Attorney, Tax Division, Department of Justice (Lanny
Welch, of Counsel, United States Attorney; Marietta Parker, of Counsel, Acting
United States Attorney; John A. DiCicco, Acting Assistant Attorney General;
Richard Farber, Attorney, Tax Division, Department of Justice; with her on the
briefs), Washington, D.C., for Defendant-Appellant.

Matthew D. Lerner, Steptoe & Johnson LLP, Washington D.C. (Lisa M. Zarlenga,
Steptoe & Johnson LLP, Washington, D.C., and James M. Armstrong, Foulston
Siefkin LLP-Wichita, Wichita, Kansas, with him on the brief), for Plaintiff-
Appellee.

---

Before **LUCERO**, **SEYMOUR**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. Introduction

The government appeals the district court's decision that taxpayer-appellee Koch Industries, Inc. was entitled to use the percentage-of-completion method of accounting under 26 U.S.C. § 460 to report $62 million in income received from the State of New Mexico for warranting a State highway would meet certain performance standards over a specified period of time. Exercising jurisdiction under 28 U.S.C. § 1291, this court **REVERSES**, and **REMANDS** for entry of judgment in favor of the government because the percentage-of-completion method of accounting applies only if "manufacture, building, installation, or construction is necessary for the taxpayer's contractual obligations to be fulfilled," 26 C.F.R. § 1.460-1(b)(2)(i), and because the percentage-of-completion method cannot be used to defer tax on income received under a guaranty, warranty, or maintenance agreement, *id.* § 1.460-1(d)(2).

## II. Background

Taxpayer-Appellee Koch Industries, Inc. ("Koch") is a corporation organized under the laws of the state of Kansas. During the period at issue, Koch was the common parent of an affiliated group of corporations and filed consolidated federal income tax returns on behalf of itself and its affiliated group of corporations. In 1995, Koch created Koch Performance Roads, Inc., to market higher cost, longer lasting roads made of a new polymer-modified asphalt. To offset the higher initial construction costs, Koch offered extended warranties to

customers. In its vision statement, Koch explained its willingness to extend fifteen to twenty year warranties on its roads as follows,

> The Performance Road objective is to provide a road with lower life cycle costs. Agencies currently spend less on initial construction and then incur greater maintenance and reconstruction expense. A Performance Road would spend more on initial construction but would incur far less maintenance and reconstruction expense leading to lower life cycle costs. It is typical to find that the breakeven point between these alternatives will occur around year 12. Therefore, in order to provide value to the customer, the warranty period typically needs to exceed 14 years.

In July 1998, Koch, through its indirect subsidiary Mesa, PDC, LLC, and the State of New Mexico Highway and Transportation Department ("New Mexico") entered into a contract entitled "Agreement for Corridor 44 Professional Services and Warranty" (Corridor Agreement) regarding the expansion of State Highway 44 ("SH44") using Koch's Performance Roads concept. Due to a lack of state funding, the parties developed a financing solution under which the state would issue financing mechanisms known as Grant Anticipation Revenue Vehicle Bonds which permitted the state to pledge future federal-aid highway funds to the repayment of the bonds. Because this plan contemplated leveraging future federal funds available to maintain the road, it was necessary to include in the contract all of the maintenance measures that would be necessary during the repayment of the bonds.

The SH44 project was divided into two phases, a construction phase and a rehabilitation phase. Koch's obligations during the rehabilitation phase were

governed by two contracts: (1) a "Pavement Warranty," that required Koch to

perform all work necessary to assure performance of the pavement[1]; and (2) a

"Structures Warranty," that required Koch to perform all work necessary to assure

performance of the structures (bridges, drainage, and erosion structures).[2] Neither

warranty agreement required New Mexico to show any design defects to give rise

to Koch's obligation to repair or replace pavement or structures. Instead, both

warranties included detailed performance criteria which SH44's pavement and

structures were required to meet. Although it was virtually certain that some

work would have to be done at some point in time under the warranty agreements,

Koch had no obligation to perform any work on the highway unless and until the

---

[1]The Pavement Warranty states:

> PDC warrants that during the term of this Warranty the Pavement shall meet the Pavement Performance Criteria. If at any time during the term of this Warranty any portion of the Pavement described in the Pavement Performance Criteria shall fail to meet the applicable Pavement Performance Criteria, PDC, shall Repair or Replace the Pavement to the extent necessary to cause such portion of the Pavement to meet the Pavement Performance Criteria.

[2]The Structures Warranty states:

> PDC warrants that during the term of this Warranty the Structures shall meet the Structures Performance Criteria. If at any time during the term of this Warranty any of the Structures shall fail to meet the Structures Performance Criteria, PDC shall Repair or Replace the Structure to the extent necessary to cause it to meet the Structure Performance Criteria.

highway and/or structures thereon failed to meet the performance standards included in the warranty agreements.

The Pavement Warranty divided the term of the warranty into four periods and listed the minimum acceptable criteria corresponding to each particular period of time. The Pavement Warranty provided up to a 21.5-year warranty term for the segments of the highway.[3] A number of the performance criteria, such as those pertaining to rut depth, delamination, and pot holes, remained constant over the entire warranty term. The performance criteria pertaining to smoothness, cracking, and depressions, however, became less stringent with the passage of time, indicating the parties did not intend the road to remain in the same condition over the warranty period.[4] The Structures Warranty provided up to a 11.5-year warranty term.[5] The minimum specifications listed in the Structures Warranty

---

[3]The exact term of pavement warranty was dependant on SH44's rate of completion and use. The warranty remained in effect until the earlier of: (1) 20 years after substantial completion of the last segment, (2) 21.5 years after substantial completion of a particular segment, or (3) the end of the calendar year in which the equivalent standard axle loads (ESALs) for a particular segment reached or exceeded 4,000,000.

[4]For example, Koch warranted that SH44's smoothness, as measured through the International Roughness Index ("IRI") in meters per kilometer, would be no worse than 1.25 m/km during the first period, 1.70 m/km during the second period, 2.10 m/km during the third period, and 2.50 m/km during the final period. IRI measures a standard vehicle's accumulated suspension motion over a particular section of road.

[5]The structures warranty remained in effect until the earlier of: (1) 11.5 years after substantial completion of the first segment, or (2) the end of the

(continued...)

similarly permitted some decline in the condition of the structures over the warranty period.

Koch received $46,753,000 for its construction phase services and $62,000,000 under the warranties covering the rehabilitation phase.[6] Section 11.11 of the Corridor Agreement required $39,000,000 of the warranty price to be allocated to pavement reconstruction costs. However, that section also explicitly stated this allocation "in itself shall create no legal liability upon [Koch] to spend any sums under the Agreement or Warranty" and emphasized that the terms and conditions of the Corridor Agreement, Pavement Warranty, and Structure Warranty were to govern the parties' obligations during the rehabilitation phase.

Koch used the percentage-of-completion method of accounting provided for in 26 U.S.C. § 460 to report the $62 million it received as consideration for the two warranties. By using this method to report its income, rather than reporting the income in the year received, Koch deferred payment of tax on the income for a substantial number of years. On audit, the Commissioner of Internal Revenue determined Koch was not entitled to use the percentage-of-completion method of accounting to report its income from its agreements with the State and, accordingly, determined deficiencies in its tax. Koch paid the resulting

[5](...continued)
calendar year in which the ESALs for a particular segment reached or exceeded 2,000,000.

[6]A total of $420,000,000 of federal funding was allotted to the project.

deficiency, filed administrative refund claims and, when those claims were denied, filed this refund suit.

The district court granted summary judgment for Koch and concluded Koch was entitled to refunds of $339,520 for 1998, $1,972,187 for 1999, $1,294,515 for 2000, and $16,596,092 for 2001, plus interest. The court concluded the warranties were long-term construction contracts to which the percentage-of-completion method could apply. The court then concluded neither of the agreements were true warranties, and the regulation did not preclude Koch's use of the percentage-of-completion method to report the $62 million payment it received in consideration for extending the two warranties.

### III. Analysis

Both parties moved for summary judgment on the issue of whether it was appropriate for Koch to use the percentage-of-completion method set out in § 460 of the Internal Revenue Code (the "Code") to report the $62 million received under the warranty agreements. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Oklahoma ex rel.*

*Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

The interpretation of a federal statute, such as § 460, is a question of law which this court reviews de novo. *True Oil Co. v. Comm'r*, 170 F.3d 1294, 1298 (10th Cir. 1999). Furthermore, "[b]ecause Congress has delegated to the Commissioner the power to promulgate 'all needful rules and regulations for the enforcement of [the Internal Revenue Code],' 26 U.S.C. § 7805(a), we must defer to his regulatory interpretations of the Code so long as they are reasonable." *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 560-61 (1991). As with all regulations, the Code's implementing regulations "must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute [they] implement[]." *Joy Techs., Inc. v Sec'y of Labor*, 99 F.3d 991, 996 (10th Cir. 1996) (quotations omitted); *see also Emery Mining Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1414 (10th Cir. 1984) ("[W]here there is an interpretation of an ambiguous regulation which is reasonable and consistent with the statute, that interpretation is to be preferred." (quotation omitted)). Furthermore, absent a statutory definition, words are to be given "their ordinary, contemporary, common meaning at the time Congress enacted the statute." *Hackwell v. United States*, 491 F.3d 1229, 1236 (10th Cir. 2007) (quotation omitted); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory

language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

Section 451 of the Code generally requires that "any item of gross income shall be included in the gross income of a taxpayer for the tax year in which the item is received by the taxpayer, unless, under the accounting method used by the taxpayer in computing taxable income, the item is properly accounted for as of a different period." 26 U.S.C. § 451; *see also INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) (stating generally that "the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes"). Thus, unless there is an applicable statutory exception, an accrual method taxpayer who receives an advance payment must include that payment in gross income at the time of receipt. *See, e.g.*, *Auto. Club of Michigan v. Comm'r*, 353 U.S. 180, 188-90 (1975); *Schulde v. Comm'r*, 372 U.S. 128, 130-37 (1963); *Am. Auto. Ass'n v. United States*, 367 U.S. 687, 691-92 (1961).

Section 460 of the Code provides such an exception, allowing the taxable income from a long-term contract to be determined under the percentage-of-completion method. 26 U.S.C. § 460(a). Use of the percentage-of-completion method to account for income from long-term construction projects is "in large part justified by the difficulty in determining the net profitability of a construction project because of fluctuating and unforeseen costs." *United States*

*v. Howard*, 855 F.2d 832, 836 (11th Cir. 1988) (referring to the "completed contract method" of long-term contract income deferral); *see also* Rev. Rul. 70-67, 1970-1 C.B. 117 (stating price fluctuations, strikes, and unexpected construction difficulties often "make[] it impossible for any construction contractor, no matter how carefully he may estimate, to tell with any certainty whether he has derived a gain or sustained a loss until a particular contract is completed").  Nevertheless, it is well established that deferral provisions, such as § 460, are to be construed strictly.  *See, e.g.*, *Estate of Bell v. Comm'r*, 928 F.2d 901, 903 (9th Cir. 1991) (holding the deferral benefits of 26 U.S.C. § 6166 are "a matter of legislative grace" and to be strictly and narrowly construed); *Elam v. Comm'r*, 477 F.2d 1333, 1335 (6th Cir. 1973) (relying on the "well settled principle that statutes granting tax exemptions or deferments must be strictly construed"); *see also Comm'r v. Jacobson*, 336 U.S. 28, 49 (1949) (stating that tax exemptions "are specifically stated and should be construed with restraint"); *Helvering v. Nw. Steel Rolling Mills, Inc.*, 311 U.S. 46, 49 (1940) ("[P]rovisions granting special tax exemptions are to be strictly construed.").

Under § 460, the term "long-term contract" is defined as "any contract for the manufacture, building, installation, or construction of property if such contract is not completed within the taxable year in which such contract is entered into."  26 U.S.C. § 460(f)(1).  The Treasury Regulations emphasize that  "[l]ong-term contract methods of accounting apply only to the gross receipts and costs

-10-

attributable to long-term contract activities." 26 C.F.R. § 1.460-1(d)(1).[7] The

Regulations also clarify that "[a] contract is for the manufacture, building,

installation, or construction of property if the manufacture, building, installation,

or construction of property *is necessary* for the taxpayer's contractual obligations

to be fulfilled and if the manufacture, building, installation, or construction of

that property has not been completed when the parties enter into the contract."

*Id.* § 1.460-1(b)(2)(i) (emphasis added). In addition, the Regulations state a

party's retention of title to and risk of loss with respect to the subject matter, as

well as the parties' characterization of their agreement, is not relevant to the

classification of a contract under § 460. *Id.*

Income not attributable to long-term contract activities "generally must be

taken into account using a permissible method of accounting other than a long-

term contract method." *Id.* § 1.460-1(d)(1). An exception, however, exists for

non-long-term contract activities "incident to or necessary for" the completion of

a long-term contract. *Id.* Examples of such non-long-term activities provided by

the Regulations include "the provision of architectural, design, engineering, and

construction management services, and the development or implementation of

_____

[7]26 C.F.R. § 1.451-3 (as amended in 1992) governs this case because 26 C.F.R. § 1.460-1 (2001), the current regulation, became effective after the agreements at issue here were executed. The parties and court below cited the current version of the regulations, and the difference is immaterial because the current and former regulations contain essentially the same language limiting use of the percentage-of-completion method.

computer software." *Id.* § 1.460-1(d)(2). The Regulations, however, have long made clear that "performance under a guaranty, warranty, or maintenance agreement is a non-long-term contract activity that is never incident to or necessary for the manufacture or construction of property under a long-term contract. *Id.*; *see also* 26 C.F.R. § 1.451-3(a)(3) (1986) (providing that "costs incurred with respect to any guarantee, warranty, maintenance, or other service agreement relating to the subject matter of such contracts, shall be accounted for under a proper method of accounting" other than long-term contract methods); *id.* § 1.451-3(d)(7) (1986) (providing that costs properly allocable to a long-term contract "do not include costs incurred with respect to any guarantee, warranty, maintenance or other service agreement relating to the subject matter of the long-term contract.").

Under the undisputed facts of this case, neither the Pavement Warranty nor the Structures Warranty are long-term contracts under § 460. To be classified as a long-term contract, "manufacture, building, installation, or construction of property [must be] necessary for the taxpayer's contractual obligations to be fulfilled." *Id.* § 1.460-1(b)(2)(i). Thus, a long-term construction contract necessarily entails a fixed and definite obligation on the part of the contractor to provide specified construction services. To be sure, § 460 is directed toward mitigating uncertainties inherent in long-term construction work. *See, e.g.*, *Howard*, 855 F.2d at 836 (referring to the fluctuating and unforeseen costs of

performing construction work); Rev. Rul. 70-67, 1970-1 C.B. 117 (highlighting price fluctuations, strikes, and unexpected construction difficulties as relevant uncertainties). Section 460, however, is not directed toward mitigating all construction-related uncertainties, such as the lack of certainty arising as the result of a party's decision to enter into a contract creating a contingent obligation to perform long-term construction work.

Neither warranty agreement required Koch to perform "manufacture, building, installation, or construction" to fulfill its contractual obligations. Rather, both warranties included detailed performance standards which SH44's pavement and structures were required to meet, many of which were lowered with the passage of time. Although it was virtually certain that some work would be performed at some point during the warranty period, Koch had no obligation to perform any work on the highway unless and until the highway and/or structures thereon failed to meet the performance standards included in the warranty agreements.[8] Indeed, the contracts explicitly stated that Koch is not obligated "to spend any sums under the Agreement or Warranty" and emphasized that the terms

_____

[8]Koch touted the low maintenance costs of it's Performance Road concept, claiming "[a] Performance Road would spend more on initial construction but would incur far less maintenance and reconstruction expense leading to lower life cycle costs." Koch recognized that the "breakeven point" between a conventional road and a Performance Road "occur[red] around year 12" of the road's life cycle, and that it was therefore necessary for "the warranty period typically . . . to exceed 14 years."

and conditions of the Corridor Agreement, Pavement Warranty, and Structure Warranty were to govern the parties' obligations during the rehabilitation phase.

Prior to entering into the warranties, Koch created preliminary financial models in an effort to assess their profitability. According to one of its managers, Koch's liabilities under the warranties depended on "the ultimate pavement design, the ultimate quality of construction, the ultimate quality of the materials used, the traffic and loading of that traffic and the weather conditions." Koch forecasted it would spend between $17,493,180 and $94,010,183 to fulfill its obligations under the warranties. However, Koch's manager testified these projections were based on "future events that cannot be predicted." The undisputed facts demonstrate there was a lack of certainty regarding what specific long-term construction work, if any, would be necessary to fulfill Koch's obligations under the warranties. As a result, the warranties are not "long-term contracts" for the purpose of § 460 of the Code.

While not directly at issue,[9] 26 C.F.R. § 1.460-1(d) is nevertheless helpful to the analysis of whether the Pavement and Structures Warranties are eligible for income deferral under § 460. Indeed, § 1.460-1(d)(2) is the only portion of the Regulations which defines "non long-term contract activity" and expressly addresses whether warranties are within the scope of § 460. Section 1.460-1(d)(2) provides:

> Non-long-term contract activity means the performance of an activity other than manufacturing, building, installation, or construction, such as the provision of architectural, design, engineering, and construction management services, and the development or implementation of computer software. In addition, performance under a guaranty, warranty, or maintenance agreement is a non-long-term contract activity that is never incident to or necessary for the manufacture or construction of property under a long-term contract.

*Id.* The regulation's statement that "performance under a guaranty, warranty, or maintenance agreement is a non-long-term contract activity" applies beyond the context of activities incident to or necessary for the completion of a long-term contract and forecloses warranty income from long-term contract treatment under

_____

[9]Section § 1.460-1(d) provides an exception allowing long-term contract methods to be used to account for non-long-term activities which are "incident to or necessary for" the completion of a long-term contract. In briefing the question of whether the warranties at issue are stand-alone long-term contracts, Koch emphasized it was not claiming the warranties were "incident to or necessary for" the completion of the underlying contract for the construction of SH44. Nevertheless, discussion of § 1.460-1(d)(2) is relevant because the section indicates not only that a warranty can never be incident to or necessary for the completion of a long-term contract, but also that "performance under a guaranty, warranty, or maintenance agreement is a non-long-term contract activity." 26 C.F.R. § 1.460-1(d)(2).

-15-

§ 460. Under the undisputed facts in this case, the two contracts at issue fall within the scope of the term warranty as used in § 1.460-1(d)(2) and are therefore not eligible for income deferral under § 460.

Although the Regulations do not define the terms "guaranty, warranty, or maintenance agreement," this phrase must be interpreted to harmonize with the objectives of § 460. *Joy Techs.*, 99 F.3d at 996. In addition, any ambiguity in the terms "guaranty, warranty, or maintenance agreement" should not be construed to expand the scope of the deferral provision. *See Estate of Bell*, 928 F.2d at 903; *Elam*, 477 F.2d at 1335. In light of these rules of construction, the contracts at issue fall within the scope of the terms "guaranty, warranty, or maintenance agreement," regardless of whether they are classified as performance warranties, service contracts, or maintenance agreements.

That the warranties may have been separately negotiated and executed, involved a lengthy warranty period, were expensive, could require Koch to perform work regardless of whether the road was defective, and involved a virtual certainty that some warranty work would be performed does not foreclose them from being within the scope of the terms "guaranty, warranty, or maintenance agreement." In its modern usage, the term warranty is not limited to warranties against manufacturing defects. Rather, it extends to warranties for future performance that guarantee a product will perform at a certain level for a stated period of time. *See, e.g.*, *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171

F.3d 818, 823 (3d Cir. 1999) (noting an agreement "to perform maintenance or repair (or both) service on a consumer product for a specified duration" are a "subspecies of warranty"). *Cf.* 18 RICHARD A. LORD, WILLISTON ON CONTRACTS §§ 52:45, 52:46 (4th ed. 2004 & Supp. 2009) (discussing generally express warranties and warranties "as to future performance" under the Uniform Commercial Code). Koch has cited no authority indicating that the Commissioner, in promulgating Treasury Regulation § 1.460-1(d)(2) and its predecessor § 1.451-3(a)(3), intended the scope of the term "warranty" to not include such performance warranties. Reading such warranties as eligible for long-term contract treatment under § 460 would improperly expand the scope of the income deferral provision. *See Estate of Bell*, 928 F.2d at 903; *Elam*, 477 F.2d at 1335.

In its agreements, Koch unmistakably warranted SH44's pavement and structures would meet certain criteria, and that it would repair or replace them to the extent necessary to bring them into compliance with the agreed upon criteria. Koch did not unconditionally obligate itself to perform any specific construction services. Instead, it offered New Mexico a performance warranty covering its work on SH44. Under the Regulations, this type of contingent activity is "a non-long term contract activity that is never incident to or necessary for the manufacture or construction of property under a long-term contract." 26 C.F.R. § 1.460-1(d)(2). Accordingly, as a matter of law, the income Koch received in

-17-

consideration of these agreements is ineligible for reporting under the percentage-of-completion method of accounting.

Based on a review of the record, there are no disputes of material fact relevant to either the question of whether the warranties are long term contracts under § 460 or whether they fall within the scope of the terms "guaranty, warranty, or maintenance agreement." The district court erred in granting summary judgment in favor of the taxpayer. Instead, summary judgment in favor of the government is appropriate.

## IV. Conclusion

For the foregoing reasons, the court holds that the undisputed facts demonstrate Koch was not entitled to use the percentage-of-completion method of accounting under 26 U.S.C. § 460 to report $62,000,000 in income it received from the State of New Mexico for warranting that SH44 would meet certain performance standards over a specified period of time. Accordingly, this court **REVERSES** the district court's decision to grant summary judgment in favor of Koch, and **REMANDS** for entry of summary judgment in favor of the government.