**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**December 30, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

STATE OF KANSAS DEPARTMENT OF
HEALTH AND ENVIRONMENT,

    Defendant - Appellee.

No. 24-3041

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:22-CV-02250-TC)**
_____

Janea L. Lamar (Kristen Clarke, Assistant Attorney General, with her on the briefs), U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C., for Plaintiff–Appellant.

David R. Cooper, Fisher, Patterson, Sayler & Smith, L.L.P., Topeka, Kansas (Crystal B. Moe, Fisher, Patterson, Sayler & Smith, L.L.P., Topeka, Kansas, and Anthony J. Powell, Solicitor General, Office of Kansas Attorney General Kris W. Kobach, Topeka, Kansas, with him on the brief), for Defendant–Appellee.
_____

Before **HOLMES**, Chief Judge, **MURPHY**, and **McHUGH**, Circuit Judges.
_____

**MURPHY**, Circuit Judge.
_____

## I.    INTRODUCTION

The Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") prohibits employers from discriminating against servicemembers because of their uniformed service. *See* Pub. L. No. 103-353, 108 Stat. 3149 (codified as amended at 38 U.S.C. §§ 4301-33). It defines "employer" as "any person, institution, organization, or other entity that pays salary or wages . . . or that has control over employment opportunities." 38 U.S.C. § 4303(4)(A).

The federal government (or "the government") brought suit on behalf of Stacy Gonzales, a member of the United States Army National Guard, against the State of Kansas, claiming a violation of USERRA by the Kansas Department of Health and Environment ("KDHE").[1] Upon cross-motions for summary judgment, the district court dismissed the suit, ruling Kansas could not be liable because it was not Gonzales's "employer" under USERRA. The government appeals the order and judgment of dismissal, arguing the district court erred by not only adopting an overly narrow construction of the term "employer," but also failing to apply the correct summary judgment standard in reviewing the record evidence.

---

[1] The complaint filed in district court named the "State of Kansas (Department of Health and Environment)" as the defendant. Consequently, the district court characterized this case as one in which "[t]he United States sued the State of Kansas, alleging the Kansas Department of Health and Environment violated [USERRA]." App. Vol. III at 709. The district court's framing of this case is not disputed on appeal. Notwithstanding the defendant-appellee identified in the caption, the court refers to Kansas as the party raising arguments on appeal.

2

The plain text of USERRA lacks any language to suggest only those who exercise direct or absolute control of employment opportunities may be considered an employer. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024) (refusing to adopt a "heightened" statutory requirement for Title VII discrimination claim by "add[ing] words . . . to the statute Congress enacted"). The statutory language further implies entities that share or co-determine matters constituting employment opportunities can each concurrently be considered employers. *See* 38 U.S.C. § 4303(4)(A)(i). Whether Kansas, through KDHE, maintained sufficient control over Gonzales's employment opportunities is ultimately a factual determination. The record evidence, when considered in the light most favorable to the non-moving party, allows a reasonable finding that KDHE retained the requisite level of control over Gonzales's employment opportunities to be a USERRA employer.[2] Therefore, exercising jurisdiction pursuant to 28 U.S.C. § 1291, the court **reverses** the district court's order and **remands** the case for further proceedings consistent with this decision.

## II.     BACKGROUND

KDHE is a state agency that provides services related to health and environment. The agency has, within its organizational structure, various divisions,

---

[2] In the district court, the parties stipulated KDHE "was a subdivision of the government of the State of Kansas." App. Vol. I at 24. On appeal, the parties agree that if KDHE is found to have been Gonzales's USERRA employer, Kansas would also have been her USERRA employer.

bureaus, and sections. The Sexually Transmitted Disease Intervention Section[3]

focuses its work on those affected by sexually transmitted infections and the Human

Immunodeficiency Virus.

During the relevant time period, the Sexually Transmitted Disease Intervention

Section received federal grants from the Center for Disease Control and Prevention

("CDC") in the form of the Sexually Transmitted Disease Prevention Award. Under

the supervision of KDHE, the Section used the grant in two primary ways: 1) it hired

disease intervention specialists ("state disease intervention specialists") and 2) it

distributed a portion of the fund as Aid-to-Local grants[4] to counties within its

jurisdiction.

State disease intervention specialists were each assigned to a clinic. Their

primary task was to interview people who were diagnosed with a communicable

disease. By conducting interviews, state disease intervention specialists were able to

identify others at risk of infection or disease transmission, inform them of their health

risk, and refer them to medical services. Depending on the circumstance, a state

disease intervention specialist may assist individuals who voluntarily walk into a

---

[3] The Sexually Transmitted Disease Intervention Section operates within the Bureau of Disease Control and Prevention. Through the Bureau of Disease Control and Prevention, a subdivision within the Division of Public Health, KDHE provides disease intervention and prevention services.

[4] KDHE distributed Aid-to-Local grants to multiple counties for various services, not limited to disease prevention services. Relevant to this appeal is only the Aid-to-Local grants administered through the Sexually Transmitted Disease Section for disease prevention.

health clinic or be deployed to specified areas based on guidance from KDHE. Each state disease intervention specialist was provided a copy of the Field Services Manual, a document written by KDHE, which identified job expectations, protocols, and metrics by which their performance was evaluated.

KDHE also offered Aid-to-Local grants to county-level agencies in exchange for localized assistance in disease prevention. Accompanying the grant was the Notice of Grant Award Amount & Summary of Program Objectives ("Notice of Grant Award") which outlined the terms, objectives, and purposes of the grant. Acceptance of the grant fund constituted acceptance of its terms. KDHE decided every fiscal year whether to renew the grant or reallocate its resources.

Finney County Health Department (or "Finney County") was a recipient of an Aid-to-Local grant from 1998 to 2010. The Notice of Grant Award identified objectives to be satisfied by a disease intervention specialist, which resembled expectations set out in the Field Services Manual. Finney County dedicated a county-level disease intervention specialist ("local disease intervention specialist") to fulfill the terms of the Aid-to-Local grant. The position was funded in part by the Aid-to-Local grant, with Finney County making up any shortfall.  The technical job responsibilities of a local disease intervention specialist essentially mirrored that of a state disease intervention specialist.

From 2001 to 2010, Stacy Gonzales served as Finney County's local disease intervention specialist. During this time, Gonzales was also an active member of the

United States Army National Guard. She intermittently had military obligations, during which she was absent from her local disease intervention specialist position.

As a local disease intervention specialist, Gonzales interfaced with representatives from both KDHE and Finney County. Her main contacts at KDHE were Derek Coppedge and Jennifer VandeVelde. Coppedge was the Manager of Field Operations for the Sexually Transmitted Disease Section from 2000 to 2008. VandeVelde succeeded Coppedge in that position from 2008 until 2013, upon Coppedge's promotion to Director of the Sexually Transmitted Disease Section in 2008. The Manager of Field Operations supervised all state and local disease intervention specialists, tracking their deployment and assessing data collected from field work. The Director of the Sexually Transmitted Disease Section oversaw the Aid-to-Local grants by communicating with the federal government, coordinating with the agency's legal department, and managing counties' compliance with the grant terms. Coppedge and VandeVelde led mandatory quarterly staff meetings for both state and local disease intervention specialists to review grant objectives and the progress made in the preceding quarter. Gonzales attended these quarterly meetings.

When she did not have military obligations, Gonzales reported daily for work at Finney County. She worked with county employees, including nurses and clinical staff. Her salary and benefits were determined by Finney County Human Resources Department, which issued her paychecks as well.

On or around April 1, 2010, a meeting was called to discuss problems with Gonzales's performance. Meeting minutes indicate those in attendance were

6

Coppedge, VandeVelde, Gonzales, and Ashley Goss. Ashley Goss was the Finney County Health Department Administrator at the time. Perceived issues were two-fold. First, Gonzales had exhibited inappropriate behavior in the workplace which had strained relationships with her co-workers. Second, Finney County was failing to meet Aid-to-Local grant objectives. Goss and Gonzales were warned the Aid-to-Local grant might not be renewed if performance did not improve. On April 9, 2010, Gonzales received a deployment order for military service beginning in October and she informed VandeVelde of her deployment.

Coppedge sent a follow-up letter, dated April 23, 2010, to Goss. The letter emphasized the performance deficiency of the disease intervention specialist in Finney County. The letter warned Finney County that if productivity did not "dramatically improve," the Aid-to-Local grant would be discontinued. App. Vol. II at 385. Coppedge scheduled a reevaluation of Finney County's performance for July 15, 2010.

In an internal email dated June 7, 2010, KDHE contemplated reallocating Finney County's Aid-to-Local grant. On July 1, 2010, KDHE decided not to renew Finney County's Aid-to-Local grant. Thereafter, Finney County terminated its local disease intervention specialist position and Gonzales became unemployed.

The government brought suit against the State of Kansas, claiming KDHE had violated USERRA. The parties filed cross-motions for summary judgment on the narrow issue of whether Kansas, through KDHE, was Gonzales's employer under

USERRA.[5] The district court granted Kansas's motion, denied the government's motion, and entered a judgment of dismissal. The district court reasoned the language of USERRA confirmed a servicemember might have more than one USERRA employer in a single job. Nevertheless, it ruled Kansas could not be Gonzales's USERRA employer because KDHE did not have any authority to hire, fire, or supervise Gonzales, or determine her salary. The government timely appealed.

## III.   DISCUSSION

The government raises two issues on appeal. First, it contends the district court adopted an overly narrow construction of the term "employer" as it is defined in USERRA. The government then asserts the district court's review of the record evidence was inconsistent with the summary judgment standard.

### A.  Definition of "Employer" under USERRA

The interpretation of a federal statute is a question of law which this court reviews de novo. *Koch Indus., Inc. v. United States*, 603 F.3d 816, 821 (10th Cir. 2010); *see WWC Holding Co. v. Sopkin*, 488 F.3d 1262, 1276 n.10 (10th Cir. 2007) ("[W]e are not limited to the parties' positions on what a statute means, because we review a question of statutory construction de novo."). The analysis begins with the statutory text. *Tarango-Delgado v. Garland*, 19 F.4th 1233, 1238 (10th Cir. 2021). Undefined terms are given their ordinary meaning as understood at the time of

___

[5] Although not relevant to this appeal, Kansas's summary judgment motion also raised arguments regarding the substantive merits of the USERRA claim, the equitable defense of laches, and the lack of basis for granting any injunctive relief.

enactment, considering the specific context in which the word is used. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566, 569 (2012). "[T]he text of a law controls over purported legislative intentions unmoored from any statutory text." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (quotation omitted).

Kansas does not provide a valid reason to deviate from the textual analysis. Its argument analogizing USERRA to the Fair Labor Standards Act is unavailing because each statute has differing definitions of "employer." *Compare* 29 U.S.C. § 203(d) *with* 38 U.S.C. § 4303(4)(A). The Supreme Court's precedent on the common-law definition of control is irrelevant because included within USERRA is a statute-specific definition of the term "employer." *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444-45, 447 (2003) (explaining courts should look to common law if Congress is silent on an undefined term and the "undefined term has a settled meaning at common law").

USERRA provides, in relevant part:

> A person who is a member of . . . , or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, . . . or obligation.

38 U.S.C. § 4311(a). The term "employer" is defined in § 4303(4)(A):

> [T]he term "employer" means any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities including--

9

(i)     a person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities;

(ii)    the Federal Government;

(iii)   a State;

(iv)    any successor in interest to a person, institution, organization, or other entity referred to in this subparagraph; and

(v)     a person, institution, organization, or other entity that has denied initial employment in violation of section 4311.

The text identifies two avenues of analysis. First, whoever pays an employee's salary or wages for the work performed is considered an employer. To pay is to "give to (a person) what is due in discharge of a debt, or as return for services done." *Pay*, Oxford English Dictionary (2d ed. 1989). Under the terms' plain meanings, "salary" and "wages" both refer to regularly paid compensation. *See Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 51-52 (2023) (defining salary as "fixed compensation regularly paid, as by the year, quarter, month, or week" and wage as "[p]ay given for labor at short[-]stated intervals" (quotation omitted)). Section 4303(2) identifies salary or wages as a monetary subcomponent of the benefits of employment. *See also Advocate Christ Med. Ctr. v. Kennedy*, 605 U.S. 1, 10 (2025) ("The word 'paid' obviously connotes a cash benefit.").

Second, "control over employment opportunities" is an alternate and sufficient basis for employer status under USERRA. 38 U.S.C. § 4303(4)(A). This statutory language can be further parsed into two subcomponents: "control over" and "employment opportunities."

To exercise control over is to "exercise power or authority over." *Control*, Oxford English Dictionary (2d ed. 1989). Although the provision does not clarify the

10

nature or degree of control necessary, absent from the text is any language to suggest only those who exercise direct or absolute control over an employee are considered employers. *See Muldrow*, 601 U.S. at 355 (refusing to adopt a "heightened" statutory requirement by "add[ing] words" to the text); *White v. United Airlines, Inc.*, 987 F.3d 616, 627 (7th Cir. 2021) ("[S]ection 4303(4)(A)(i) does not require that an 'employer' have direct control over the matters that constitute a USERRA violation[,] . . . only that the employer must have control over the plaintiff's employment opportunities writ large.").

Pursuant to § 4303(4)(A)(i), those who perform employment-related responsibilities upon delegation by the employer also fall within the ambit of employer. This provision implies a servicemember may have more than one employer at a time as long as each employer either pays salary or wages or controls employment opportunities: 1) the employer that delegates the performance of employment-related responsibilities and 2) those to whom the responsibilities have been delegated. "The use of the word 'delegate[]' suggests an intent to reach both direct and indirect employers," provided each employer satisfies at least one of the two conditions identified in § 4303(4)(A). *White*, 987 F.3d at 627.

As a result, the term "control" must be construed to recognize that a servicemember can have more than one employer. *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009) ("[W]ell-established principles of statutory interpretation . . . require statutes to be construed in a manner that gives effect to all of their provisions."). Even entities that share or co-determine matters

11

constituting employment opportunities can concurrently be employers. *Cf. Knitter v. Corvias Mil. Living, LLC*, 758 F.3d 1214, 1226 (10th Cir. 2014) (explaining the joint-employer test under Title VII of the Civil Rights Act of 1964); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (observing USERRA "is very similar to Title VII"). The key determination concerns not the purported employer's "purely formal" functions, *White*, 987 F.3d at 627, but whether an entity individually exercises sufficient control over the servicemember's employment opportunities, *cf. Knitter*, 758 F.3d at 1226; *see Estes v. Merit Sys. Prot. Bd.*, 658 F. App'x 1029, 1032 (Fed. Cir. 2016).

Implementing regulations from the Department of Labor support this textual analysis.[6] *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 402 (2024) (recognizing the non-binding but persuasive weight of "interpretations of those responsible for implementing particular statutes"). The agency confirmed not only that a servicemember may have more than one employer but also provided an example of the nature and scope of "control" necessary to be found a USERRA employer:

> For example, if the employee is a security guard hired by a security company and he or she is assigned to a work site, the employee may report both to the security company and to the site owner. In such an instance, both employers share responsibility for compliance with USERRA.

---

[6] 38 U.S.C. § 4331(a) authorizes the Secretary of Labor to "prescribe regulations implementing the provisions of [USERRA] with regard to the application of [the statute] to States, local governments, and private employers."

20 C.F.R. § 1002.37 (2025).[7]

The phrase "employment opportunities," on the other hand, refers both to opportunities for obtaining employment and opportunities within the scope of one's employment. *Compare* 38 U.S.C. § 4303(4)(A)(v) (treating as employers those who deny initial employment), *and United States v. Nevada*, 817 F. Supp. 2d 1230, 1238 (D. Nev. 2011) (assessing which entity possessed the authority to hire employees), *with Estes*, 658 F. App'x at 1032 (discussing retention and termination of employment),[8] *and White*, 987 F.3d at 626-27 (suggesting those who determine certain terms and benefits of employment may be considered employers).

Drawing a categorical distinction, Kansas argues no employment relationship can exist between Kansas and Gonzales because Finney County is the recipient of the Aid-to-Local grant, not Gonzales. Kansas theorizes that assessing USERRA liability by looking beyond contractual relationships would have no backstop. For instance,

---

[7] This agency interpretation first became effective in 2006 and has remained consistent since. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning.").

[8] *Estes v. Merit Systems Protection Board* provided the following illustration:

For example, if an agency knows it is the only entity hiring contractors from a third[-]party company and the agency states that a contractor is no longer welcome on any of its contracts, the agency could be deemed to exercise control over the employee's continued employment status because the third[-]party company would have nowhere else to place the contractor and would therefore have no choice but to fire him.

658 F. App'x 1029, 1032 (Fed. Cir. 2016).

Kansas points out there is no reason why the government's interpretation would not apply up the chain of grantor-grantee relationships and expose the CDC to liability as Gonzales's USERRA employer since the Sexually Transmitted Disease Prevention Award, used to fund the Aid-to-Local grants, originated from the CDC. Because federal grants constitute a significant portion of state government funding, Kansas warns, an expansive interpretation of the scope of USERRA employer would implicate countless grantor-grantee relationships and expose the federal government to potentially significant liability. Kansas concludes Congress could not have intended such an outcome.

Kansas's position is not supported by the statutory language, which identifies no exceptions or alternate framework by which to analyze entities administering grants.[9] *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."). Moreover, USERRA calls for a case-specific analysis to determine not only employer status,[10] but also whether the employer engaged in discriminatory conduct. 38 U.S.C. §§ 4303(4)(A); 4311(b)-(c). As they are based merely on speculation, Kansas's slippery-slope concerns are unpersuasive. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 435-36 (2006) (rejecting a slippery-

---

[9] Section 4303(4)(A) identifies two exceptions to the definition of employer: § 4303(4)(B) and § 4303(4)(C). Neither of these exceptions apply to grantor-grantee relationships.

[10] *See infra* Section III.B.

slope argument based on "feasibility of case-by-case consideration"); *see also Silva v. Dep't of Homeland Sec.*, 112 M.S.P.R. 362, 369 (M.S.P.B. 2009) (explaining that just because the government may be a USERRA employer to one contractor does not mean the government is considered the USERRA employer of all contractors). This leaves two questions, whether there is sufficient evidence that Kansas, through KDHE, 1) paid Gonzales's wages or salary or 2) exercised some control over employment opportunities of Gonzales.

## B. Kansas's Motion for Summary Judgment

The court reviews a district court's grant of summary judgment de novo, applying the same legal standard used by the district court. *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1278 (10th Cir. 2004). A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When reviewing cross-motions for summary judgment, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made . . . ." *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000) (quotation omitted).

### 1. *Payment of Wages or Salary*

Based on the record facts and the arguments of the parties on appeal, Kansas does not satisfy the first condition for being Gonzales's employer. Although the Aid-to-Local grant funded a portion of Gonzales's salary, Finney County issued her paychecks. The district court determined Finney County maintained "exclusive

15

authority over Gonzales's salary, method of payment, and benefits." App. Vol. III at 721. The government does not dispute this determination on appeal. The record demonstrates Gonzales's salary and benefits were determined by the Finney County Human Resources Department according to its pay scale, "based off of [the employee's] education and the type of work that [the employee was] going to do." App. Vol. II at 417. Because the government concedes only Finney County paid Gonzales's salary, Kansas does not satisfy the first condition identified in § 4304(4)(A) and is not, therefore, Gonzales's USERRA employer on that basis.

### 2. *Control over Employment Opportunities*

The parties agree: whether KDHE exercised a sufficient degree of control over Gonzales's employment opportunities is ultimately a factual determination. This approach is consistent with how courts have analyzed the issue arising under other statutes. *See, e.g.*, *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964) (National Labor Standard Act); *Lambertsen v. Utah Dep't of Corr.*, 79 F.3d 1024, 1028-29 (10th Cir. 1996) (Title VII of the Civil Rights Act of 1964); *Dole v. Snell*, 875 F.2d 802, 805-08 (10th Cir. 1989) (Fair Labor Standards Act).

The district court ruled Kansas was not Gonzales's employer based on three underlying assessments: KDHE had 1) no authority to hire or fire Gonzales; 2) no authority to supervise her; and 3) no input regarding her pay or benefits. The government does not challenge the third basis but argues the first two reflect an improper application of the summary judgment standard. The government contends

the district court incorrectly resolved genuine disputes of material fact by viewing the evidence and drawing inferences in Kansas's favor.

### a. Authority to Hire or Fire

Rather than soliciting or receiving applications, KDHE approached counties to gauge their interest in furthering disease intervention efforts in exchange for Aid-to-Local grants. Both VandeVelde and Coppedge understood the Aid-to-Local grants as a means of funding the local disease intervention specialist role. Correspondingly, Finney County's Health Department Administrator, Goss, sought to fulfill the terms of the Notice of Grant Award by hiring a dedicated local disease intervention specialist. The local disease intervention specialist position for Finney County provided Gonzales, who was already a county employee, with an employment opportunity.

Gonzales recalled being interviewed by Coppedge. Coppedge explained that, whenever he participated in hiring local disease intervention specialists, he was part of an interviewing team, a panel composed usually of three or four other panelists. Once the interviews were complete, Coppedge conferred with other panelists, providing input in ranking the candidates. Thereafter, he participated in deciding who the county would hire.[11]

---

[11] Coppedge, whose deposition was taken more than twenty years after the interview, did not think he participated in Gonzales's interview and could not recall having any involvement in her hiring process. Gonzales, on the other hand, could not remember anyone other than Coppedge who interviewed her. The district court stated Finney County staff interviewed Gonzales and noted Coppedge's presence at the

Aid-to-Local grants were renewed on an annual basis. Although counties were allowed to indicate their willingness to continue receiving the grant by applying for a renewal, the directors at KDHE had the final say on whether the grant would be renewed. During at least one fiscal year, the Aid-to-Local grant funded as much as approximately 86% of Gonzales's salary.

When the funding from KDHE stopped, the local disease intervention position for Finney County was terminated. Shortly before the grant was ended, Goss had a discussion with Gonzales about Gonzales's performance issues. Goss recalled the following about that conversation:

> Well, then [I told Gonzales] we need to figure this out because [KDHE was] going to take our funding, and at that time we discussed other [job] options. I asked [Gonzales] what she wanted to do because again, I didn't want to have to figure something else out for her. I wanted her to be able to stay on.

App. Vol. II at 430. Goss testified all of the available positions with the county would require a reduction in salary and Gonzales's employment with Finney County ended.

The evidence indicates KDHE had some influence on the hiring of Gonzales in 2001 and the elimination of her position in 2010. Whether that rose to the level of KDHE being a USERRA employer by having sufficient control of Gonzales's employment opportunities was something the district court did not adequately

---

interview. Nevertheless, it did not acknowledge Gonzales's testimony that she could not recall any Finney County employee who interviewed her.

18

address under Rule 56. *See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016); *Christian Heritage Acad. v. Okla. Second Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) ("Even where parties file cross[-]motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts."). In sum, it ruled that "Finney County alone had the authority to hire and fire Gonzales." App. Vol. III at 720. It stated that it was Finney County staff who interviewed Gonzales although it did acknowledge Coppedge's presence. The district court's description of the interview as being conducted by Finney County, however, did not address contrary inferences from Gonzales's testimony or inferences from Coppedge's testimony that his usual practice was to be actively involved in the selection process. It treated the grant as a wall between KDHE and Gonzales that rendered the relationship as one solely between KDHE and Finney County without any effect on Gonzales's employment opportunities under USERRA. Further, the district court did not factor in grant funds as the source of most of Gonzales's salary in analyzing employment opportunities.

### b. Supervision

The district court addressed supervision of Gonzales in an equally cramped manner as it did when considering the authority to hire and fire, i.e. viewing the grant as insulating KDHE against any notion it controlled Gonzales's employment opportunities. Beginning with the training of Gonzales and progressing through her continued supervision and evaluation as a local disease intervention specialist, the

19

district court minimized the involvement of KDHE and emphasized Finney County's supervision of Gonzales's workplace behavior.

KDHE established the training requirements for the local disease intervention specialist position. Coppedge explained he supervised all the state disease intervention specialists and local disease intervention specialists.[12] Gonzales received training from KDHE to fulfill her role, including on-the-job training from Coppedge on how to conduct field work. Her field work was audited based on standards set in the Field Services Manual, a document written by KDHE. The district court did note that Coppedge conducted field audits of Gonzales's work; that VandeVelde provided Gonzales feedback on the quality and quantity of her work; and that "Gonzales chafed under VandeVelde's supervision."[13] App. Vol. III at 714.

---

[12] During his deposition, Coppedge had the following exchange with counsel for the government:

> Q: Who did you supervise when you were the manager of field operations?
>
> A: All the state DISs and all the [local] DISs.
>
> Q: Was there anyone within that STD program who you supervised other than the DISs?
>
> A: My recollection is no. I think Allen had the office personnel.
>
> Q: When you say DIS, do you mean disease intervention specialist?
>
> A: Yes. It's the same.

App. Vol. III at 629.

[13] In an affidavit, Gonzales testified VandeVelde made negative comments about her military service on three occasions. In one instance, VandeVelde

Gonzales appeared for work daily at the Finney County Health Department where she shared office space with county employees, including Goss. Interpersonal issues between Gonzales and Finney County staff were reported to and addressed by Goss. The evidence indicates Gonzales reported to both KDHE and Finney County regarding different aspects of her job. *See* 20 C.F.R. § 1002.37. Each entity, in turn, retained supervisory authority over the part of her job that it oversaw.

There is evidence Gonzales's performance evaluations were a joint venture involving both Finney County and KDHE. The relevant form, labeled Finney County Performance Evaluation Form, broke out the evaluation into two general categories: Basic Job Performance and General Work Performance. The form was filled out and signed by Finney County's administrator, Goss. KDHE, however, provided the input for the Basic Job Performance section because Goss lacked knowledge and data of Gonzales's substantive work. As to the Basic Job Performance section, Goss merely performed the ministerial function of incorporating KDHE's evaluation. *See Nevada*, 817 F. Supp. 2d at 1238 (citing 20 C.F.R. § 1002.5(d)(1)(i)).

While the district court acknowledged Gonzales could have more than one employer, its approach looked at only one side of the ledger. That Gonzales may have interacted more with Goss and that Goss had disciplinary authority over Gonzales's

---

questioned Gonzales about an injury sustained during military service and whether it was interfering with her ability to carry out disease intervention duties. Gonzales testified she felt VandeVelde was mocking her regarding her military service. Second and third occasions occurred during early 2010, when Gonzales informed VandeVelde of upcoming military obligations. VandeVelde told Gonzales she needed to choose between her military service and her career with KDHE.

office behavior, while relevant, does not negate Gonzales's interaction with KDHE in training, supervision, and evaluation of the substantive duties of a local disease intervention specialist. The district court's summary judgment ruling was driven by its erroneous view of the grant relationship between KDHE and Finney County. It treated the grant as a mere funding mechanism. As a consequence, it viewed KDHE's dealings with Gonzales, not as supervision, but as its oversight of Finney County's grant performance. The district court specifically diminished KDHE's involvement in the performance evaluation by noting it was Goss that gave the performance review and that KDHE was merely focusing on Gonzales's performance of Finney County's duties under the grant. This approach did not properly consider, as was clear to all relevant persons, that it was Gonzales who was solely tasked with Finney County fulfilling its grant obligations.[14]

The district court's summary judgment ruling was not consistent with the charge of Rule 56 to view the evidence in the light most favorable to Gonzales, the non-moving party, and to recognize a genuine dispute of material fact. *See Sup. Ct. of N.M.*, 839 F.3d at 906-07.

## IV.    CONCLUSION

There is sufficient evidence to preclude summary judgment on the issue of whether Kansas is Gonzales's USERRA employer. The district court's order granting

---

[14] The evidence suggests, during her employment, Gonzales was the only local disease intervention specialist at Finney County.

summary judgment is therefore **reversed.** Because Kansas raised other arguments in its summary judgment motion which the district court has not yet addressed, this matter is **remanded** for further proceeding in accordance with this opinion.